## NGIRAINGAS ET AL. *v.* SANCHEZ ET AL.

No. 88–1281.   Argued January 8, 1990—Decided April 24, 1990

BLACKMUN, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, STEVENS, and O'CONNOR, JJ., joined, and in all but Part II–B of which SCALIA, J., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 193. KENNEDY, J., took no part in the consideration or decision of the case.

*Jeffrey R. Siegel* argued the cause and filed a brief for petitioners.

*Patrick Mason*, Deputy Attorney General of Guam, argued the cause for respondents. With him on the brief was *Elizabeth Barrett-Anderson*, Attorney General.

*James A. Feldman* argued the cause for the United States as *amicus curiae* urging affirmance. On the brief were *Solicitor General Starr*, *Assistant Attorney General Gerson*, *Deputy Solicitor General Shapiro*, and *Paul J. Larkin, Jr.**

JUSTICE BLACKMUN delivered the opinion of the Court.†

In this case we must decide whether a Territory or an officer of the Territory acting in his or her official capacity is a "person" within the meaning of 42 U. S. C. § 1983 (1982 ed.).

---

*Briefs of *amici curiae* urging affirmance were filed for the Commonwealth of the Northern Mariana Islands by *Edward Manibusan*, Attorney General, and *David A. Webber, Gail B. Geiger*, and *Richard Weil*, Assistant Attorneys General; and for the Government of the Virgin Islands *ex rel.* de Castro by *Godfrey R. de Castro*, Attorney General, *pro se, Rosalie Simmonds Ballentine*, Solicitor General, and *Darlene C. Grant* and *Jesse P. Goode*, Assistant Attorneys General.

†JUSTICE SCALIA does not join Part II–B of this opinion.

## I

Petitioners Alex Ngiraingas, Oscar Ongklungel, Jimmy Moses, Arthur Mechol, Jonas Ngeheed, and Bolandis Ngiraingas filed suit in the District Court of Guam, alleging numerous constitutional violations and seeking damages under § 1983.[1] The named defendants were the Government of Guam, the Guam Police Department, the Director of the Police Department in her official capacity, and various Guam police officers in their official and individual capacities.

Petitioners were arrested by Guam police on suspicion of having committed narcotics offenses. The complaint, as finally amended, alleged that petitioners were taken to police headquarters in Agana where officers assaulted them and forced them to write and sign statements confessing narcotics crimes.

The District Court dismissed the claims against the Government of Guam and the police department on the ground that Guam was immune from suit under the Organic Act of Guam, 64 Stat. 384, § 3, as amended, 48 U. S. C. § 1421a (1982 ed.), unless Congress or the Guam Legislature waived Guam's immunity. App. to Pet. for Cert. A-4 to A-6. The District Court also dismissed the action against the individual defendants in their official capacities, explaining that because

---

[1] Title 42 U. S. C. § 1983 (1982 ed.) reads in full:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."

Petitioners also sought damages under 42 U. S. C. §§ 1981, 1985, and 1986 (1982 ed.).

a judgment against the individuals in their official capacities would affect the public treasury, the real party in interest was the Government of Guam. *Ibid.*

The Court of Appeals for the Ninth Circuit affirmed in part and reversed in part. 858 F. 2d 1368 (1988) (superseding the opinion at 849 F. 2d 372). Analogizing the government to an admininstrative agency, the court ruled that Guam is "no more than" a federal instrumentality, and thus is not a person within the meaning of § 1983. 858 F. 2d, at 1371–1372. "For the same reasons," the police department, also, is not a person under § 1983. *Id.*, at 1372. Finally, the Court of Appeals ruled that Guam officials may not be sued in their official capacities under § 1983, because a judgment against those defendants in their official capacities would affect the public treasury and the suit essentially would be one against the government itself. *Ibid.*[2] Accordingly, the court affirmed the District Court's dismissal of the claims against the Government of Guam, the Guam Police Department, and the individual defendants in their official capacities.[3]

---

[2] Inasmuch as the Court of Appeals held that Guam is not a person for purposes of § 1983, it did not decide whether Guam enjoyed sovereign immunity under the Eleventh Amendment. 858 F. 2d, at 1372, n. 2.

[3] The Court of Appeals ruled that respondent police officers could be sued under § 1983 in their individual capacities to the extent they were not entitled to immunity. The court determined that the police officers were not entitled to immunity from suit in their individual capacities by virtue of § 3 of the Organic Act, as amended, 48 U. S. C. § 1421a (1982 ed.). 858 F. 2d, at 1373. In the court's view, that provision applied only to suits against the Government of Guam and, perhaps, suits against government officers acting in their official capacities. *Ibid.* Nevertheless, the court held that the defendant officers were entitled to invoke qualified immunity under *Harlow* v. *Fitzgerald*, 457 U. S. 800 (1982). The Ninth Circuit therefore reversed the District Court's dismissal of the action against the police officers in their individual capacities and directed the District Court partially to reinstate the complaint and to consider whether the individual officers were entitled to qualified immunity. 858 F. 2d, at 1374.

Because of the importance of the question, and because at least one other Court of Appeals has advanced a different view as to whether a Territory is subject to liability under § 1983,[4] we granted certiorari, 493 U. S. 807 (1989).

## II

## A

Guam, an island of a little more than 200 square miles located in the west central Pacific, became a United States possession at the conclusion of the Spanish-American War by the Treaty of Paris, Art. II, 30 Stat. 1755. Except for the period from December 1941 to July 1944, when Japan invaded and occupied the island, the United States Navy administered Guam's affairs from 1898 to 1950, when the Organic Act was passed.[5] Among other things, the Act provided for an elected governor and established Guam as an unincorporated Territory. 48 U. S. C. §§ 1421a and 1422 (1982 ed.). It was said at the time that this unincorporated status did not promise eventual statehood. See H. R. Rep. No. 1365, App. No. 3, 81st Cong., 1st Sess., 9 (1949). The United States continues to this day to have a military presence in Guam, with an Air Force base, a Navy communications base, air and weather stations, and a large complex that serves the Seventh Fleet.[6]

To determine whether Guam constitutes a "person" within the meaning of § 1983, we examine the statute's language and purpose. The current version relates to "[e]very person who [acts] under color of any statute . . . of any State or Terri-

---

[4] See *Frett* v. *Government of Virgin Islands*, 839 F. 2d 968 (CA3 1988) (Government of Virgin Islands is subject to same liability under § 1983 as any other governmental entity). See also *Fleming* v. *Department of Public Safety, Commonwealth of Northern Mariana Islands*, 837 F. 2d 401 (CA9), cert. denied, 488 U. S. 889 (1988), discussed by the Ninth Circuit in the instant case, 858 F. 2d, at 1371, n. 1.

[5] See A. Leibowitz, Defining Status: A Comprehensive Analysis of United States Territorial Relations 313, 323 (1989).

[6] See Leibowitz, *supra*, at 348.

tory." The statute itself obviously affords no clue as to whether its word "person" includes a Territory. We seek, therefore, indicia of congressional intent at the time the statute was enacted. See *District of Columbia* v. *Carter*, 409 U. S. 418, 425 (1973) (analysis of purposes and scope of § 1983 must "take cognizance of the events and passions of the time at which it was enacted"). See also *United States* v. *Price*, 383 U. S. 787, 803 (1966).

B

Our review of § 1983's history uncovers no sign that Congress was thinking of Territories when it enacted the statute over a century ago in 1871. The historical background shows with stark clarity that Congress was concerned only with events "stateside." "Section 1983 was originally enacted as § 1 of the Civil Rights Act of 1871. The Act was enacted for the purpose of enforcing the provisions of the Fourteenth Amendment." *Quern* v. *Jordan*, 440 U. S. 332, 354 (1979) (BRENNAN, J., concurring in judgment); see also *Carter*, 409 U. S., at 423 ("[Section] 1983 has its roots in § 1 of the Ku Klux Klan Act of 1871, Act of Apr. 20, 1871"). After the War Between the States, race relations in the Southern States were troubled. The Ku Klux Klan, organized by southern whites, commenced "a wave of murders and assaults . . . against both blacks and Union sympathizers." *Id.*, at 425. Congress was worried "about the insecurity of life and property in the South," and designed § 1 of the Act "primarily in response to the unwillingness or inability of the *state* governments to enforce their own laws against those violating the civil rights of others." *Id.*, at 425–426 (emphasis added).[7] "The debates are replete with references to the

---

[7] The Ku Klux Act grew out of a message sent to Congress by President Grant on March 23, 1871. It said:

"A condition of affairs now exists in some States of the Union rendering life and property insecure and the carrying of the mails and the collection of the revenue dangerous. The proof that such a condition of affairs exists in some localities is now before the Senate. That the power to correct these

lawless conditions existing in the South in 1871. There was available to the Congress during these debates a report, nearly 600 pages in length, dealing with the activities of the Klan and the inability of the state governments to cope with it. This report was drawn on by many of the speakers" (footnote omitted). *Monroe* v. *Pape,* 365 U. S. 167, 174 (1961) (overruled in certain other respects by *Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658 (1978)).

Because Congress was directly concerned with this unrest in the Southern States, it specifically focused on States in the legislation aimed at solving the problem. "As initially enacted, § 1 of the 1871 Act applied only to action under color of the law of any 'State.' 17 Stat. 13."[8] *Carter,* 409 U. S., at 424, n. 11. Persons acting under color of law of any Territory were not included. Viewed against "the events and passions of the time," *id.,* at 425, it is evident that Congress was not concerned with Territories when it enacted the Civil Rights Act of 1871, but was concerned, instead, with the "hundreds of outrages committed . . . through the agency of this Ku Klux organization [that had not been] punished" in the Southern States. Cong. Globe, 42d Cong., 1st Sess., 505 (1871) (remarks of Sen. Pratt). As to Congress' failure to include persons acting under color of law of any Territory,

---

evils is beyond the control of State authorities I do not doubt; that the power of the Executive of the United States, acting within the limits of existing laws, is sufficient for present emergencies is not clear." See Cong. Globe, 42d Cong., 1st Sess., 244. See also *Monroe* v. *Pape,* 365 U. S. 167, 172–173 (1961).

[8] The Act of Apr. 20, 1871, § 1, 17 Stat. 13, read:

"That any person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress; such proceeding to be prosecuted in the several district or circuit courts of the United States . . . ."

"[w]e can only conclude that this silence on the matter is itself a significant indication of the legislative intent of § 1." *Quern*, 440 U. S., at 343. The omission demonstrates that Congress did not mean to subject Territories to liability under this statute.

Further, the remedy provided by § 1983 was designed to combat the perceived evil. "Congress recognized the need for original federal court jurisdiction as a means to provide at least indirect federal control over the unconstitutional actions of state officials." *Carter*, 409 U. S., at 428. "'The United States courts are further above mere local influence than the county courts; their judges can act with more independence, cannot be put under terror, as local judges can; their sympathies are not so nearly identified with those of the vicinage . . . .'" *Ibid.* (quoting Cong. Globe, 42d Cong., 1st Sess., 460 (1871) (remarks of Rep. Coburn)). Because the organization of the judicial system of a Territory was unlike those of the States, it would not have engendered such immediate concern. "Under the organic acts, each territory had three justices appointed by the president for four-year terms. Sitting together, they constituted a supreme court; sitting separately, they acted as district judges. In both capacities they had jurisdiction over cases arising under United States or territorial law." E. Pomeroy, The Territories and the United States 1861–1890, Studies in Colonial Administration 51 (1947). Thus, unlike the state courts, over which the Federal Government had no control, the territorial courts were created by Acts of Congress, with judges appointed by the President, and were under the general control of the Federal Government.

## C

Finally, the successive enactments of the statute, in context, further reveal the lack of any intent on the part of Congress to include Territories as persons. In 1871, the Act exposed to liability "any person [acting] under color of any law . . . of any State." Act of Apr. 20, 1871, § 1, 17 Stat. 13.

Such persons in the 1871 Act could not possibly have included a Territory because "Territories are not 'States' within the meaning of the Fourteenth Amendment," and a Territory could not have been a "person [acting] under color of" any state law. *Carter*, 409 U. S., at 424, n. 11. Any attempt to interpret "person" as including a "Territory" would be too strained a reading of the statute and would lead to a far more "awkward" interpretation than what a majority of the Court found significant in *Will* v. *Michigan Dept. of State Police*, 491 U. S. 58, 64 (1989) (to read § 1983 as saying that " 'every person including a State, who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects . . .' " would be "a decidedly awkward way of expressing an intent to subject the States to liability").

This reading of the original statute is supported by its next enactment. In 1874, the phrase "or Territory" was added to § 1, without explanation, in the 1874 codification and revision of the United States Statutes at Large. Rev. Stat. § 1979. See *Carter*, 409 U. S., at 424, n. 11. But while the 1874 amendment exposed to liability "[e]very person [acting] under color of any [law] . . . of any . . . Territory," it did not expose a Territory itself to liability. In the same revision that added "Territory" to § 1, Congress amended § 2 of the Act of Feb. 25, 1871, 16 Stat. 431 (the "Dictionary Act"), "which supplied rules of construction for all legislation." *Monell* v. *New York City Dept. of Social Services*, 436 U. S., at 719 (REHNQUIST, J., dissenting); see also *Will*, 491 U. S., at 78 (BRENNAN, J., dissenting). In 1871, § 2 of the Dictionary Act defined "person" as including "bodies politic and corporate."[9] The 1874 recodification omitted those three words and substituted "partnerships and corpora-

---

[9] "That in all acts hereafter passed . . . the word 'person' may extend and be applied to bodies politic and corporate . . . ." 16 Stat. 431.

tions."[10]   It is significant that at the time Congress added "Territory" to § 1983, so that a person acting under color of territorial law could be liable under the statute, Congress clarified the definition of those whose actions could give rise to § 1983 liability.   Most significant is the asserted reason for doing so:

> "The reasons for the latter change [substituting 'partnerships and corporations' for 'bodies politic and corporate'] are that partnerships ought to be included; and that if the phrase 'bodies politic' is precisely equivalent to 'corporations,' it is redundant; but if, on the contrary, 'body politic' is somewhat broader, and should be understood to include a government, such as a State, while 'corporation' should be confined to an association of natural persons on whom government has conferred continuous succession, then the provision goes further than is convenient.   It requires the draughtsman, in the majority of cases of employing the word 'person,' to take care that States, Territories, foreign governments, &c., appear to be excluded."   1 Revision of the United States Statutes as Drafted 19 (1872).

As these comments make clear, at the time Congress first made it possible for a person acting under color of territorial law to be held liable, the very same Congress pointedly redefined the word "person" to make it clear that a Territory would not be included.[11]   It is evident that Congress did not

---

[10] "In determining the meaning of the revised statutes, or of any act or resolution of Congress passed subsequent to February twenty-fifth, eighteen hundred and seventy-one, . . . the word 'person' may extend and be applied to partnerships and corporations . . . ."   Rev. Stat. § 1.   Because the words "or Territory" were added in the very "revised statutes" to which the language in the Dictionary Act refers, we conclude that the amended definition of "person" is the definition to which we look in determining whether a Territory is included in that definition.

[11] This reasoning is fully consistent with the Court's decision in *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658 (1978).   There the Court held that a municipality could be a "person [acting] under color of any law . . . of any State," Act of Apr. 20, 1871, § 1, 17 Stat. 13, and thus

intend to encompass a Territory among those "persons" who could be exposed to § 1983 liability. "Just as '[w]e are not at liberty to seek ingenious analytical instruments' to avoid giving a congressional enactment the broad scope its language and origins may require, *United States* v. *Price*, 383 U. S., at 801, so too are we not at liberty to recast this statute to expand its application beyond the limited reach Congress gave it." *Carter*, 409 U. S., at 432.

In conclusion, when we examine the confluence of § 1983's language, its purpose, and its successive enactments, together with the fact that Congress has defined "person" to exclude Territories, it becomes clear that Congress did not intend to include Territories as persons who would be liable under § 1983.

Petitioners concede, Brief for Petitioners 4, 50, and we agree, that if Guam is not a person, neither are its officers acting in their official capacity.

We hold that neither the Territory of Guam nor its officers acting in their official capacities are "persons" under § 1983.[12] The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

---

was exposed to liability under the 1871 statute. In concluding that the 1871 Congress specifically intended to subject municipalities to § 1983 liability, we relied, among other things, on indications in the legislative history that municipal liability was contemplated, on the general treatment of corporations (including municipal corporations) as "persons," and on the 1871 version of the Dictionary Act. 436 U. S., at 686–689. As has been explained, the 1871 Congress had no similar intent with respect to Territories, and when it did address Territories in 1874, Congress intended not to subject them to liability. The 1874 revisions of the Dictionary Act, however, must be considered in light of the previously and more specifically expressed intent to subject municipalities to liability.

More recently, there have been at least two attempts in Congress to amend § 1983 to include States and Territories within the meaning of persons. The bills did not leave Committee. See Sagafi-Nejad, Proposed Amendments to Section 1983 Introduced in the Senate, 27 St. Louis U. L. J. 373, 374, 376, n. 21 (1983).

[12] This conclusion makes it unnecessary to consider Guam's claim of immunity under the Eleventh Amendment.

JUSTICE KENNEDY took no part in the consideration or decision of this case.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

Today the Court holds that neither a Territory nor an officer of the Territory acting in his or her official capacity is a "person" within the meaning of § 1983.[1]  I believe that the opposite conclusion is compelled by the history, legislative and otherwise, surrounding the passage of § 1983 and by the absence of any immunity on the part of Territories from congressional enactments.  Therefore, I respectfully dissent.

I

The Court's determination that "Congress did not intend to include Territories as persons who would be liable under § 1983," *ante*, at 192, rests primarily on its conclusion that "review of § 1983's history uncovers no sign that Congress was thinking of Territories when it enacted the statute over a century ago in 1871." *Ante*, at 187.  The Court's review, however, is incomplete.  Our decision in *District of Columbia* v. *Carter*, 409 U. S. 418 (1973), set forth ample evidence that Congress had the Territories in mind when it enacted the predecessor of § 1983, the Civil Rights Act of 1871.  *Carter* held that the District of Columbia is not a "State or Territory" for purposes of § 1983:

> "[S]ince the District is itself the seat of the National Government, Congress was in a position to observe and, to a

---

[1] Title 42 U. S. C. § 1983 (1982 ed.) provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."

large extent, supervise the activities of local officials. Thus, the rationale underlying Congress' decision not to enact legislation similar to § 1983 with respect to federal officials—the assumption that the Federal Government could keep its own officers under control—is equally applicable to the situation then existing in the District of Columbia." *Id.*, at 429–430 (footnote omitted).

We noted, however, that the situation in the other Territories was dramatically different. While acknowledging that, as a legal matter, "Congress also possessed plenary power over the Territories," *id.*, at 430, we noted that "[f]or practical reasons, however, effective federal control over the activities of territorial officials was virtually impossible." *Ibid.* We explained:

> "'[T]he territories were not ruled immediately from Washington; in a day of poor roads and slow mails, it was unthinkable that they should be. Rather, Congress left municipal law to be developed largely by the territorial legislatures, within the framework of organic acts and subject to a retained power of veto. The scope of self-government exercised under these delegations was nearly as broad as that enjoyed by the States.'" *Id.*, at 430–431, quoting *Glidden Co.* v. *Zdanok*, 370 U. S. 530, 546 (1962) (opinion of Harlan, J.).

We also noted, contrary to the Court's implication today, see *ante*, at 189, that because territorial judges were appointed to a term of only four years, they "were peculiarly susceptible to local pressures, since their reappointments were often dependent upon favorable recommendations of the territorial legislatures." *Carter*, *supra*, at 431, n. 28; see also L. Friedman, A History of American Law 142 (1973) (noting the corruption common among territorial judges); E. Pomeroy, The Territories and the United States 1861–1890, Studies in Colonial Administration 52–56 (1947) (same). We concluded

that "although the Constitution vested control over the Territories in the Congress, its practical control was both 'confused and ineffective,' making the problem of enforcement of civil rights in the Territories more similar to the problem as it existed in the States than in the District of Columbia." *Carter, supra,* at 431 (footnote omitted), quoting E. Pomeroy, *supra,* at 4; see also *Examining Board of Engineers, Architects and Surveyors* v. *Flores de Otero,* 426 U. S. 572, 596 (1976) ("Congress . . . lacked effective control over actions taken by territorial officials, although its authority to govern was plenary").

Our recognition in *Carter* that Congress was concerned with the protection of civil rights in the Territories when it fashioned the scope of § 1983 is fully supported by the historical events surrounding the statute's enactment. In the years preceding the passage of the Civil Rights Act of 1871, turmoil and racially motivated violence in the Territories focused Congress' attention on the need for federal protection of basic civil rights there. The Territories, of course, had been a principal source of friction between the North and the South before the Civil War.[2] The idea of "squatter sovereignty," advanced by Stephen A. Douglas of Illinois and enshrined in the Compromise of 1850, allowed citizens of each Territory to decide for themselves whether they would join the Union as citizens of a slave or free State. The Compromise of 1850 provided that the admissions of Utah and New Mexico were to be governed by "squatter sovereignty," and

---

[2] The 1820 Missouri Compromise established that Territories would be admitted to statehood in pairs, one slave and one free, and that slavery was forever to be prohibited in that part of the Louisiana Purchase north of the southern boundary of Missouri (36° 30′). Following this pattern, in 1837 Arkansas and Michigan were admitted as a slave and free State, respectively. In 1845, Florida from the South and, in 1846, Iowa from the Northwest became States. Texas entered the Union as a slave State in 1845 and California as a free State in 1850. Thereafter, balance was impossible: Minnesota in 1858 and Oregon in 1859 were both admitted as free States.

the Kansas-Nebraska Act of 1854 extended the principle to those Territories as well. The resulting disputes within the Territories between abolitionist and proslavery groups gave rise to rampant acts of violence, the best illustration of which has come to be known as "bleeding Kansas."

In the 1855 elections for the Kansas Territorial Legislature, several thousand "border ruffians" crossed over from Missouri to stuff ballot boxes and ensure the election of a legislature that would, and did, pass a drastic slave code. See S. Morison, H. Commager, & W. Leuchtenburg, A Concise History of the American Republic 260 (2d ed. 1983). The free-state forces in Kansas responded by setting up their own rump government, and "by 1856 Kansas had two governments, both illegal." *Ibid.* What followed was a "savage conflict" between the two sides. *Ibid.* "Into Kansas thronged Southern and Northern zealots, brawlers, adventurers, and land jobbers. From New England, financed by Boston money, moved Abolitionist immigrants who were led by their ministers but who also brought their rifles with them." L. Hacker, The Shaping of the American Tradition 468 (1947). Public buildings were burned, and supporters of each side were murdered. In retaliation for the slaying of two Abolitionists, John Brown killed five proslavery men at Osawatomie Creek. In sum, in what "might almost be regarded as the opening battle of the civil war," 1 J. Blaine, Twenty Years of Congress: From Lincoln to Garfield 121 (1884), law and order broke down completely.

This and other examples of turbulence in the Territories[3] were very much on Congress' mind when it enacted the Civil Rights Act of 1871. Congress would not have discussed the Territories so often in its deliberations unless it intended the Act to apply there. Proponents of the measure stressed

---

[3] See, *e. g.*, E. Pomeroy, The Territories and the United States 1861–1890, Studies in Colonial Administration 107 (1947) ("'A State signifies law and order, . . . a Territory violence and disorder'"), quoting the Colorado Springs Gazette, June 10, 1876.

the important role the Federal Government had played in curbing the prewar spread of slavery in the Territories. See, *e. g.*, Cong. Globe, 42d Cong., 1st Sess., 335 (1871) (remarks of Rep. Hoar) ("[T]he great Northwest was saved from slavery by the national power. . . . If it had not been for the benignant interposition of the national authority against the local desire to establish despotism, those great States of Illinois, Indiana, Ohio, Michigan, and Wisconsin would have been to-day slave-holding States"). Some legislators drew an explicit linkage between the Civil Rights Act and violence in the Territories, characterizing opponents of the legislation as "[t]he same men [who] were wont to ridicule 'bleeding Kansas.'" *Id.*, at 414 (remarks of Rep. Roberts). Others emphasized the importance of extending to "every individual citizen of the Republic in every State *and Territory* of the Union . . . the extent of the rights guarantied to him by the Constitution." See *id.*, at App. 81 (remarks of Rep. Bingham) (emphasis added); see also *id.*, at App. 86 (remarks of Rep. Bingham) (referring to "justice for all . . . on the frontiers of your widely extended domain").[4] The Civil Rights Act was intended "to protect and defend and give remedies for their wrongs to *all* the people" and thus to be "liberally and beneficently construed." *Id.*, at App. 68 (remarks of Rep. Shellabarger) (emphasis added). In sum, Congress contemplated that the Civil Rights Act of 1871 would extend to the Territories.

---

[4] Critics of the proposal were quick to point out that "th[e] bill applie[d] to the punishment of offenses in all the country," and that the type of "offenses of a mob character" at which § 1983 was directed were "by no means confined to the South, but [also extended] to the North and West, where undetected and unprincipled perpetrators of crimes, both singly and in couples, or in larger numbers, ha[d] a remarkable ingenuity in their dark and criminal transactions." Cong. Globe, 42d Cong., 1st Sess., 416 (1871) (remarks of Rep. Biggs) (also discussing the possibility that the Mormons in Utah, then a Territory, would be liable under the Civil Rights Act for their actions because they were in "a standing state of insurrection against fundamental principles of public policy, if not of law").

This conclusion is bolstered by the fact that in 1867 Congress had extended suffrage to all adult males in the Territories, including Afro-Americans, at a time when the States were still permitted to deny the right to vote on account of race.[5] See Cong. Globe, 39th Cong., 1st Sess. 2600–2602 (1866). The organic Acts establishing territorial governments were amended to provide:

> "[T]here shall be no denial of the elective franchise in any of the Territories of the United States, now, or hereafter to be organized, to any citizen thereof, on account of race, color, or previous condition of servitude; and all acts or parts of acts, either of Congress or the Legislative Assemblies of said Territories, inconsistent with the provisions of this act, are hereby declared null and void." 14 Stat. 379 (1867).

See also E. McPherson, The Political History of the United States of America During the Period of Reconstruction 184 (1871); E. Foner, Reconstruction: America's Unfinished Revolution 1863–1877, p. 272 (1988). In 1874, Congress passed legislation to ensure that every Territory's organic Act included the protections of the Constitution and civil rights embodied in other federal laws. See Rev. Stat. § 1891 (1874).

The extension of these basic federal rights and the recognition of the concomitant need for federal enforcement[6] dem-

---

[5] The Fifteenth Amendment prohibiting racial discrimination in suffrage was not ratified until 1870.

[6] See, e. g., Cong. Globe, 39th Cong., 2d Sess., 452 (1867) (remarks of Rep. Dawes) ("[N]ever in the history of territorial governments have the rights of the citizen, without distinction of race or color, been so guarant[eed] and protected, . . . as they are at this hour in [the Territory of Colorado and the Territory of Nebraska]. The civil rights bill, which is above any territorial legislation or any adverse judicial decision in a Territory where our power is supreme, has guarantied to him beyond peril every civil right known under the Constitution of the United States . . . so that every citizen of the United States, be he high or be he low, be he white or be he black, of whatsoever name or nation or color or clime, to-day in the

onstrate that Congress intended Territories to be considered "persons" for purposes of § 1983. Of course, the specific reference to "Territory" in § 1983's predecessor was not added until 1874, some three years after the initial passage of the Civil Rights Act. But this is of no moment. Although there is no legislative history to explain the addition,[7] see *Carter*, 409 U. S., at 424, n. 11, we have noted that "[t]he evident aim was to insure that all persons residing in the Territories not be denied, by persons acting under color of territorial law, rights guaranteed them by the Constitution and laws of the United States." *Flores de Otero*, 426 U. S., at 582–583. Congress' overriding concern lay in providing strong remedies for civil rights violations in the Territories. Because few measures are more effective than suing the government directly for damages, see *Owen* v. *City of Independence*, 445 U. S. 622, 650–656 (1980); *Quern* v. *Jordan*, 440 U. S. 332, 357–365 (1979) (BRENNAN, J., concurring in judgment), I believe that Congress intended a Territory to fall within the class of "persons" potentially liable under § 1983.

The majority urges that this construction would create a somewhat "awkward" interpretation of the statute, *ante*, at 190, since Territories by definition act "under color of" their own laws. I do not find this awkwardness determinative, however, because § 1983 also extends to *natural persons* who act under color of territorial law. The under-color-of-law requirement serves to ensure that not every act of these natural persons in their private capacities gives rise to § 1983 liability. The only method of avoiding the redundancy of which the majority complains would have been to replace the

Territory of Nebraska enjoys, beyond the power of local laws or adverse judicial decisions, every right, civil or political, known under the Constitution of the United States").

[7] The absence of fanfare surrounding the 1874 amendment suggests that the amendment was perceived as a technical correction that did not alter the statute's intended meaning, bolstering the conclusion that Congress had meant to include Territories all along.

catchall term "persons" with a detailed list of each separate category of possible defendants. That approach would have been even more "awkward" than the one ultimately chosen by Congress. In any event, I thought that we enforced the statutes drafted by Congress whether or not they flowed "trippingly on the tongue."

Neither is my conclusion that Territories are "persons" under § 1983 undermined by the 1874 recodification of the Dictionary Act, which altered the definition of "person" by replacing the phrase "bodies politic and corporate" with "partnerships and corporations." 1 Revision of the United States Statutes as Drafted 19 (1872) (hereinafter Draft). The Court suggests that Congress clarified the definition of "person" in the Dictionary Act to exclude Territories even while at the same time making clear that § 1983 covered civil rights abuses in the Territories. See *ante*, at 189–192. The notion that Congress would have moved simultaneously in such contrary directions is implausible. At any rate, there is little authoritative support for the Court's view, since the recodification of the Dictionary Act was accompanied not by legislative history from Congress itself but only by comments from commissioners appointed to revise the United States Code. See *ante*, at 190–191 (citing the remarks of the commissioners). "Under established canons of statutory construction, 'it will not be inferred that Congress, in revising and consolidating the laws, intended to change their effect unless such intention is clearly expressed.'" *Finley* v. *United States*, 490 U. S. 545, 554 (1989), quoting *Anderson* v. *Pacific Coast S. S. Co.*, 225 U. S. 187, 199 (1912). The revision of the Dictionary Act surely does not evince a clear intent to change the scope of § 1983. To the contrary, the preface to the revision explains that the definitions supplied are merely presumptive in the sense that "the provisions of this Title are peculiarly provisional and experimental. They are put forward as questions, not as decisions. They are to guide in commencing the task of revision, and are in turn to

be revised and developed as that task proceeds." 1 Draft, at 1. I do not think that Congress would have undertaken so tentatively the substantial alterations described by the majority.

Even were I to accept the Court's premise that whether Territories are "persons" for purposes of § 1983 must be analyzed in light of the 1874 recodification of the Dictionary Act, I would reach the same conclusion. Although the recodification eliminated the reference to "body politic," this change did not exclude Territories from the scope of § 1983 because the recodification also provided that "the word 'person' may extend and be applied to partnerships and *corporations*," *id.*, at 19 (emphasis added). At the time of the revision the term "corporation" generally was thought to include political entities such as a Territory. See Cong. Globe, 39th Cong., 2d Sess., 451 (1867) (remarks of Rep. Bingham) (referring to the Territory of Nebraska as "a corporation"). "The word 'corporations,' in its largest sense, has a more extensive meaning than people generally are aware of. Any body politic (sole or aggregate) whether its power be restricted or transcendant is in this sense 'a corporation.'" *Chisholm* v. *Georgia*, 2 Dall. 419, 447 (1793) (Iredell, J.).[8] A Territory thus would

---

[8] At common law, a "corporation" was an "artificial perso[n] endowed with the legal capacity of perpetual succession" consisting either of a single individual (termed a "corporation sole") or of a collection of several individuals (a "corporation aggregate"). 3 H. Stephen, Commentaries on the Laws of England 166, 168 (1st Am. ed. 1845). The sovereign was considered a corporation. See *id.*, at 170; see also 1 W. Blackstone, Commentaries *467. Under the definitions supplied by contemporary law dictionaries, Territories would have been classified as "corporations" (and hence as "persons") at the time that § 1983 was enacted and the Dictionary Act recodified. See W. Anderson, A Dictionary of Law 261 (1893) ("All corporations were originally modeled upon a state or nation"); 1 J. Bouvier, A Law Dictionary Adapted to the Constitution and Laws of the United States of America 318–319 (11th ed. 1866) ("In this extensive sense the United States may be termed a corporation"); *Van Brocklin* v. *Tennessee*, 117 U. S. 151, 154 (1886) ( "'The United States is a . . . great corporation . . . ordained and established by the American people'") (quoting *United*

qualify as a "person" even under the 1874 recodification of the Dictionary Act.

## II

Respondents argue that any congressional intent to subject Territories to liability as "persons" under § 1983 is belied by our previous conclusion that "in enacting § 1983, Congress did not intend to override well-established immunities or defenses under the common law." *Will* v. *Michigan Department of State Police*, 491 U. S. 58, 66–67 (1989); see also *Quern* v. *Jordan*, 440 U. S., at 341–343. Respondents note that in *Will*, we relied heavily on such a rule of construction in holding that States are not "persons" within the meaning of § 1983. We reasoned that "in deciphering congressional intent as to the scope of § 1983, the scope of the Eleventh Amendment is a consideration," because "Congress, in passing § 1983, had no intention to disturb the States' Eleventh Amendment immunity and so to alter the Federal-State balance in that respect." 491 U. S., at 66.

The concerns animating this rule of interpretation, however, are absent here because Territories have never possessed the type of immunity thought to be enjoyed by States. The Eleventh Amendment does not of its own force apply to the Territories, and the Organic Act of Guam, 64 Stat. 384 (codified at 48 U. S. C. § 1421 *et seq.* (1982 ed.)), which makes applicable to Guam numerous specific sections of the Constitution and Bill of Rights, expressly *does not* confer Eleventh Amendment immunity on the Territory. See 48 U. S. C. § 1421b(u) (1982 ed.).[9]  Even if the Eleventh

---

*States* v. *Maurice*, 26 F. Cas. 1211, 1216 (No. 15,747) (CC Va. 1823) (Marshall, C. J.)); *Cotton* v. *United States*, 11 How. 229, 231 (1851) (United States is "a corporation"). See generally *Trustees of Dartmouth College* v. *Woodward*, 4 Wheat. 518, 561–562 (1819) (explaining history of term "corporation").

[9] The Organic Act of Guam, enacted in 1950, established that the Government of Guam "shall have power to sue" under its own name. See § 1421a. The Organic Act originally was silent concerning the Territory's

Amendment reflects a common-law principle of state sovereign immunity against actions in federal court—a view I do not accept, see *Atascadero State Hospital* v. *Scanlon*, 473 U. S. 234, 258–302 (1985) (BRENNAN, J., dissenting)— the Constitution certainly does not embody such a form of common-law immunity applicable to *Territories*.

The plenary nature of federal authority over the Territories dispels any suggestion that they may assert a common-law immunity against a federal claim in a federal court. The Territories Clause provides without qualification that "[t]he Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U. S. Const., Art. IV, § 3, cl. 2. An unincorporated Territory "exists at the behest of Congress. By a simple vote of the Congress, the Organic Act under which the unincorporated territory exists may be repealed and the limited self government which it

---

ability to be sued. In 1959, Congress amended the Organic Act to provide that the government, "with the consent of the legislature evidenced by enacted law, may be sued upon any contract entered into with respect to, or any tort committed incident to, the exercise by the government of Guam of any of its lawful powers." *Ibid.* Respondents contend that the 1959 amendment provides the only exceptions to an otherwise universally applicable sovereign immunity bestowed by the Organic Act itself.

I disagree. The limited authorization for legislative waiver of sovereign immunity refers solely to claims arising under territorial law. The scheme is therefore fully consistent with the understanding that the 1950 Act granted Guam *only* immunity from suit in its own courts for violations of its own law. The immunity conferred by the 1950 Act corresponded to the common-law notion of sovereign immunity. See *Kawananakoa* v. *Polyblank*, 205 U. S. 349, 353 (1907). In 1959, Congress carved out a potential waiver of some of that immunity, but nowhere in either law did Congress suggest that it intended Guam to be immune from suit in federal court under federal law. See H. R. Rep. No. 214, 86th Cong., 1st Sess., 1–3 (1959); S. Rep. No. 969, 86th Cong., 1st Sess., 1–3 (1959); H. R. Rep. No. 1677, 81st Cong., 2d Sess., 12 (1950); S. Rep. No. 2109, 81st Cong., 2d Sess., 13 (1950).

enjoys nullified." Brief for Government of Virgin Islands as *Amicus Curiae* 8.[10] "The Government of a State does not derive its powers from the United States, while the Government of [a Territory] owes its existence wholly to the United States. . . . The jurisdiction and authority of the United States over that [T]erritory and its inhabitants, for all legitimate purposes of government, is paramount." *Grafton* v. *United States*, 206 U. S. 333, 354 (1907). Congress has "entire dominion and sovereignty" and "full legislative power" over the Territories. *Simms* v. *Simms*, 175 U. S. 162, 168 (1899); see also *Binns* v. *United States*, 194 U. S. 486, 491 (1904); *Late Corp. of Church of Jesus Christ of Latter-day Saints* v. *United States*, 136 U. S. 1, 42–43, 45 (1890). "[Congress] may make a void Act of the territorial government valid, and a valid Act void. In other words, it has full and complete legislative authority over the People of the Territories and all the departments of the territorial governments." *National Bank* v. *County of Yankton*, 101 U. S. 129, 133 (1880); see also *Sere* v. *Pitot*, 6 Cranch 332, 336–337 (1810); *American Ins. Co.* v. *356 Bales of Cotton*, 1 Pet. 511, 542–543 (1828). Whatever limits the Constitution imposes on the exercise of federal power in the Territories, see *United States* v. *Verdugo-Urquidez*, 494 U. S. 259, 268–269

---

[10] Congressional supremacy, however, does not support the Court of Appeals' conclusion that Guam is outside the coverage of § 1983 because it is an instrumentality of the Federal Government. Under the Court of Appeals' approach, even a natural person acting under color of Guam law would be beyond the scope of § 1983—a result flatly inconsistent with any view of the statute. See *Examining Board of Engineers, Architects and Surveyors* v. *Flores de Otero*, 426 U. S. 572, 582–584 (1976) (referring to the availability of § 1983 actions against persons "acting under color of territorial law"). I read the majority opinion today as rejecting the Court of Appeals' analysis. See also, *e. g.*, House Committee on Interior and Insular Affairs, Report of the Commission on the Application of Federal Laws to Guam, H. R. Doc. No. 212, 82d Cong., 1st Sess., 15 (1951) (listing 42 U. S. C. § 1983, then codified at 8 U. S. C. § 43 (1946 ed.), as among the statutes of the United States applicable to Guam).

(1990) (discussing the Insular Cases), sovereign immunity is not one of them.

We have recognized the concept of sovereign immunity "on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends." *Kawananakoa* v. *Polyblank*, 205 U. S. 349, 353 (1907). Our understanding of common-law sovereign immunity does not protect against liability under the laws of a superior governmental authority. See *Owen* v. *City of Independence*, 445 U. S., at 647–648, and n. 30. In addition, while the concept of immunity may afford a sovereign protection from suit "in its own courts without its consent, . . . it affords no support for a claim of immunity in another sovereign's courts." *Nevada* v. *Hall*, 440 U. S. 410, 416 (1979). These principles lead ineluctably to the conclusion that although a Territory may retain common-law sovereign immunity against claims raised in its own courts under its own *local* laws, see *Puerto Rico* v. *Shell Co. (P. R.)*, 302 U. S. 253, 262, 264 (1937); *Porto Rico* v. *Rosaly*, 227 U. S. 270, 273–274 (1913); *Kawananakoa, supra*, at 353–354, a Territory, particularly an unincorporated Territory such as Guam that is not destined for statehood, see *Rosaly, supra*, at 274, can have no immunity against a claim like the one here—a suit in federal court based on federal law.[11]

The Court in *Will* reasoned that Congress would not have abrogated state sovereign immunity, exemplified by the Eleventh Amendment, without a clearer statement of its intent to do so; today, the Court finds that a Territory lacking such sovereign immunity, either under the common law or by congressional grace, is not a "person" either. These conclusions are in tension. To the extent that our decision in *Will*

---

[11] Cases cited by respondents as evidence of territorial immunity, such as *Wisconsin* v. *Doty*, 1 Wis. 396, 407 (1844); *Langford* v. *King*, 1 Mont. 33, 38 (1868); *Beachy* v. *Lamkin*, 1 Idaho 50, 52 (1866); *Fisk* v. *Cuthbert*, 2 Mont. 593, 598 (1877), are irrelevant because they involve claims asserted under *territorial* rather than *federal* law.

reasoned that States are not "persons" within the meaning of § 1983 because Congress *presumably* would not have abrogated state sovereign immunity without a clear statement of its intent to do so, the *opposite* presumption should control this case: Because Congress has such plenary legal authority over a Territory's affairs and because a Territory can assert no immunity against the laws of Congress (except insofar as Congress itself grants immunity), we ought to *presume* that Territories are "persons" for purposes of § 1983.

I would hold that both Territories and territorial officers acting in their official capacities are "persons" within the meaning of § 1983 and that Guam has no sovereign immunity from suits in federal court under federal law. I therefore respectfully dissent.