**Joan C. O'CALLAGHAN, Plaintiff,**

v.

**DISTRICT OF COLUMBIA, et al., Defendants.**

Civ. A. No. 89–1015.

United States District Court, District of Columbia.

June 22, 1990.

John P. Racin, Washington, D.C., for plaintiff.

Earnest Franklin, Jr., Office of the Corp. Counsel, Washington, D.C., for defendants.

MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

### I. *Introduction*

Plaintiff Joan C. O'Callaghan brings this action for declaratory relief and damages under 42 U.S.C. § 1983 (1982). She alleges that defendants, the District of Columbia ("the District"), Maurice T. Turner, Jr., Charles Samarra, and Edward J. Spurlock,[1] approved and implemented an undercover "sting" operation that resulted in the violation of her fifth amendment right to due process. In addition, she asserts a pendent claim of tortious conversion. Presently before the Court is plaintiff's motion for summary judgment on the issue of liability.[2]

### II. *Background*

The essential facts are not in dispute. In mid–1987, members of the District's Metropolitan Police Department ("MPD") began implementing "Operation Killjoy," a four month undercover "sting" operation designed to combat motor vehicle theft. Under the Operation, undercover MPD officers established an auto body shop where they "purchased" stolen vehicles.[3] The transactions, which were recorded by concealed video cameras, led to the apprehension of numerous recidivist auto thieves. The Operation was funded in large part by insurance companies. In particular, they provided the cash with which the "purchases" were made.

From the outset, Operation Killjoy called for the secret storage of recovered vehicles in Maryland; this storage was designed to prevent "target" sellers from seeing the vehicles on the street again and becoming suspicious. *See* Spurlock Dep. at 13. Thus, those who planned and approved the Operation anticipated that rightful owners would be deprived of their recovered vehicles for as long as four months. Moreover, it was understood that these owners would not even be notified of the recovery until after the Operation had ended. Those who planned and approved the Operation realized that, absent such notice, most owners would settle their insurance claims regarding the vehicles, since it was "common knowledge" that insurers settle such claims within approximately thirty days of theft.[4] *See id.* at 18–20, 22, 27–28.

Operation Killjoy was planned and implemented by officers in the MPD's Special Operations Division, Repeat Offenders Project ("ROP"). It was approved by defendant Spurlock, then-Commander of ROP, who in turn sent the proposal through the full chain of command to defendant Turner, then-Chief of the MPD. *See id.* at 4–5. At the very least, Turner was aware of the specifics of the Operation and acquiesced in its implementation.[5]

Over the course of the Operation, 119 vehicles were recovered, almost all within a few days of being stolen. Plaintiff's 1965 Buick Skylark was one of them. Plaintiff's car was stolen in the District on September 25, 1987. Plaintiff immediately notified the police. Undercover officers detailed to Operation Killjoy recovered the Skylark four

---

**1.** The individual defendants were in the chain of command that approved the operation, and are sued both personally and in their official capacities.

**2.** At the outset, we note that our decision to address this motion on the merits is not compelled. Since defendants failed to file a timely opposition, Local Rule 108(b) entitles us to treat plaintiff's motion as conceded. *See* Orders filed May 25, 1990, May 31, 1990, and June 18, 1990.

**3.** The first vehicle was "purchased" on July 18, 1987, and the last was "purchased" on November 19, 1987.

**4.** Those officials who planned and approved the Operation seem not to have been concerned with the fairness of these individual settlements, even though it was clear that many of those settling would, because of the force of their circumstances, end up accepting sums which would not fully compensate them for their injuries.

**5.** Spurlock recalls receiving written authorization to go forward with the Operation. When asked whether Turner would have personally approved the Operation, Spurlock responded, "Verbally or in writing, he probably would have. I know that he knew about it." Spurlock Dep. at 10–11; *see also id.* at 12–15 (Spurlock's approval of secret storage was conveyed up the chain of command and, "at the least, [his] superiors acquiesced in the approval"). After the Operation had ended, Turner "hailed [it] as an important part of the city's anticar theft program...." Skolada Dep., Ex. 4.

days later, but pursuant to Operation procedure, the car was placed in storage and plaintiff received no notice of the recovery until after the Operation had ended. In fact, the police provided no information to plaintiff until January 22, 1988, over two months after the Operation had ended, and almost four months after the recovery. At that time, an MPD officer falsely told her that the Skylark had only recently been recovered from a "skinny white guy" who had been driving it. *See* O'Callaghan Aff. at 1. Plaintiff obtained repossession of her car on January 27, 1988.

Plaintiff alleges that defendants, by adopting an express policy of non-notification and secret storage as part of the Operation, accorded no weight to the owners' legitimate possessory interests in their vehicles. The implementation of this policy, she argues, resulted in: (1) the deprivation of her property rights, both procedural and substantive, in violation of the due process clause of the fifth amendment; and (2) the tortious conversion of her automobile. For the reasons that follow, we hold that plaintiff is entitled to summary judgment on both counts.

### III. *Plaintiff's Claim Under Section 1983*

#### A. *Defendants are "Persons" Within the Meaning of Section 1983*

Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law....

42 U.S.C. § 1983. Congress added "or the District of Columbia" to this provision in 1979.[6] Prior to that time, District officials could not be sued under section 1983 because the Supreme Court had held that the District was not a "State or Territory" within that section's meaning. *See District of Columbia v. Carter*, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973).

Five years after *Carter*, the Supreme Court held that municipalities and their officers were "persons" under section 1983. *See Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The District is a municipal corporation. *See* D.C.Code § 1–102(a) (1981); House Report, *supra* note 6, at 2, U.S.Code Cong. & Admin.News 1979, p. 2610. In passing the 1979 amendments, Congress' express intent was to extend the principles underlying *Monell* to the District, and thereby render District officials liable for civil rights deprivations under section 1983. *See* House Report, *supra* note 6, at 1–3, U.S.Code Cong. & Admin.News 1979, pp. 2609–2611. Therefore, defendants undeniably are "persons" within that section's meaning.[7]

---

**6.** At the same time, Congress also amended the corresponding jurisdictional provision, which reads, in pertinent part:

> (a) The district courts shall have original jurisdiction of any civil action ... commenced by any person:
>
> ....
>
> (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States....
>
> ....
>
> (b) For purposes of this section—
> (1) the District of Columbia shall be considered to be a State[.]

28 U.S.C. § 1343 (1988). Prior to 1979, as well as now, subsection (a)(3), which paraphrases 42 U.S.C. § 1983, used only the word "State."

Rather than adding to that subsection the words "or the District of Columbia," Congress simply added subsection (b)(1) to clarify that jurisdiction extended to the District. *See* H.R.Rep. No. 548, 96th Cong., 1st Sess., at 3 (1979), U.S.Code Cong. & Admin.News 1979, pp. 2609, 2611 [hereinafter House Report]. In so doing, Congress in no way implied that the District should be considered a state for purposes of § *1983*. *See infra* note 7 and accompanying text.

**7.** *Ngiraingas v. Sanchez*, — U.S. —, 110 S.Ct. 1737, 109 L.Ed.2d 163 (1990) (neither the Territory of Guam nor its officers acting in their official capacities are "persons" under § 1983), and *Will v. Michigan Dep't of State Police*, — U.S. —, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (neither a state nor its officials acting in their official capacities are "persons" under § 1983), do not counsel otherwise. The holding in *Ngi-*

## B. Operation Killjoy is Attributable to the District

■ The District may be held liable for causing a constitutional deprivation through an officially adopted "policy statement," *Monell,* 436 U.S. at 690, 98 S.Ct. at 2036 or through a custom or usage that, though never formally approved through "official decisionmaking channels," *id.* at 690–91, 98 S.Ct. at 2035–36, may nonetheless "be said to represent official policy." *Id.* at 694, 98 S.Ct. at 2037–38. In either case, the essential requirement is that the policy or custom be sanctioned by the "final policymaking authority" in that area of the city's business. *See St. Louis v. Praprotnik,* 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988) (plurality opinion) (citing *Pembaur v. Cincinnati,* 475 U.S. 469, 482–83 & n. 12, 106 S.Ct. 1292, 1299–1300 & n. 12, 89 L.Ed.2d 452 (1986) (plurality opinion)).[8] This occurs not only when a subordinate casts a decision in the form of a policy statement that the supervising policymaker "expressly approve[s]," but also when the subordinate makes "a series of decisions" that "manifested a 'custom or usage' of which the supervisor must have been aware." *Id.* at 130, 108 S.Ct. at 927.

■ Applying these standards, we have no trouble concluding that Operation Killjoy was sanctioned by Turner, and therefore represents a policy, custom, or usage attributable to the District itself. At all relevant times, Turner, as Chief of Police, was the MPD's "final policymaking authority." *See Praprotnik,* 485 U.S. at 123, 108 S.Ct. at 924 (plurality opinion). Under applicable regulations, he was the MPD's "chief executive officer," and as such had "authority to plan and prescribe departmental policy," including "the coordination, direction and control of all Metropolitan Police programs, services, and operations." D.C.Mun. Regs. tit. 6A, §§ 800.1, 800.16 (1984). Furthermore, he was empowered "to delegate authority" to subordinates "in such a degree as in his ... judgment [was] necessary to establish and maintain efficiency and good administration." *Id.* § 800.20.[9]

The evidence demonstrates that Turner, in addition to being "chief executive officer" of the MPD, also sanctioned Operation Killjoy. Spurlock testified that after approving the final plan for Killjoy, he forwarded it through the chain of command for Turner's approval. *See* Spurlock Dep. at 5. After being informed of the plan, including its provision for secret storage of recovered vehicles, Turner authorized Spurlock to implement it. *See id.* at 9–11, 14–15. The evidence further indicates that Turner was aware that owners would not be notified when their vehicles were recovered, and that they would not be allowed to repossess their vehicles until after the Operation was over. *See id.* at 18–19, 20, 22, 27–28.[10] Thus, Turner either "expressly approved" the non-notification and secret storage provisions or knowingly acquiesced in their implementation. *See Praprotnik,* 485 U.S. at 130, 108 S.Ct. at 927 (plurality opinion).

Moreover, Operation Killjoy clearly constituted a policy, custom, or usage. "[T]he word 'policy' generally implies a course of action consciously chosen from among various alternatives." *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427,

---

*raingas* was based on "the lack of any intent on the part of Congress to include Territories as persons." 110 S.Ct. at 1741. In contrast, Congress clearly intended to treat District officials as "persons," and a suit against such officials in their official capacities is equivalent to a suit against the District itself. *See Will,* 109 S.Ct. at 2311. The holding in *Will* was based on the 11th amendment, *see id.* at 2309, which applies to states but not to the District. *Committee of Blind Vendors v. District of Columbia,* 695 F.Supp. 1234, 1241 n. 6 (D.D.C.1988); *see Morris v. Washington Metro. Area Transit Auth.,* 781 F.2d 218, 219–20, 228 (D.C.Cir.1986).

8. Whether a particular official has "final policymaking authority" is a question of District law. *Praprotnik,* 485 U.S. at 123, 108 S.Ct. at 924 (citing *Pembaur,* 475 U.S. at 483, 106 S.Ct. at 1300 (plurality opinion)).

9. These regulations were superseded in 1988.

10. Although the present motion is deemed unopposed, we note that defendants' opposition does not establish that a genuine dispute exists as to this fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

2436, 85 L.Ed.2d 791 (1985). Operation Killjoy was chosen in precisely this manner. *See* Spurlock Dep. at 3–4; Skolada Dep. at 9–12. It was planned for several months, committed to writing, sanctioned by Turner, and put into effect for four months. It yielded 119 recovered vehicles, which, pursuant to Operation procedure, were secretly stored without notice to their owners until after the Operation ended. *See* Skolada Dep. at 13, 14–15. Under these circumstances, we hold that the deprivation suffered by these owners resulted from an established, governmental procedure, not some random action on the part of a lower level District employee. *See Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 3203, 82 L.Ed.2d 393 (1984). We turn now to the substance of plaintiff's due process claim.

### C. *Operation Killjoy Violated Plaintiff's Fifth Amendment Rights*

█ In order to prevail, plaintiff must show that defendants deprived her of property "without due process of law." U.S. Const. amend. V;[11] *see West v. Atkins,* 487 U.S. 42, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988). In determining whether procedural due process was accorded, we must consider three separate factors: first, the private interest affected; "second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value ... of additional or substitute procedural safeguards;" and third, the District's interest. *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976) (citation omitted); *see also Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 434, 102 S.Ct. 1148, 1157, 71 L.Ed.2d 265 (1982) (citations omitted). As for the first factor, plaintiff obviously had a strong interest in repossessing her Skylark once the police recovered it. As for the second, because not a single protective procedure was in place, deprivation was a virtual certainty. Turning to the third factor, although the District's interest in the integrity of the Operation was strong,

*some* procedural protection of plaintiff's interest was required.

█ When an established governmental policy will cause a person injury, the government normally must provide a pre-deprivation process to determine whether the injury will be proper and, if not, the amount of compensation due. *See Zimmerman Brush,* 455 U.S. at 436, 102 S.Ct. at 1158; *see also Parratt v. Taylor,* 451 U.S. 527, 537, 101 S.Ct. 1908, 1914, 68 L.Ed.2d 420 (1981). A postdeprivation process is constitutionally inadequate unless quick governmental action is necessary or unless providing a predeprivation process is otherwise impracticable. *See Zimmerman Brush,* 455 U.S. at 436, 102 S.Ct. at 1158 (citations omitted). This is particularly true where, as here, the District's only postdeprivation process "comes in the form of an independent tort action." *Id.; see infra* Sec. IV.

█ While we decline to delineate the precise protections that were due, at the very least plaintiff was entitled to prompt notification when her Skylark was recovered and some form of compensation for the four month deprivation that followed. Defendants provided nothing of the kind, despite the fact that MPD officers ordinarily must "immediately notify" owners when their vehicles are recovered. MPD General Order 401.1, pt. I(I)(6) (1984). According to Spurlock, providing notice would have "defeated" "the ends of justice." *See* Spurlock Dep. at 25. This position is completely unfounded. Even assuming that secret storage was essential to the Operation's integrity, we fail to see what threat would have been posed had the police simply notified owners of their vehicles' recovery and compensated them for the deprivation that followed. To add insult to injury, however, when the police finally informed plaintiff that her car had been recovered, they lied about having kept it for four months and offered her no compensation. Without a doubt, defendants' conduct resulted in a

---

**11.** The fifth amendment applies to the District. *See Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct.

693, 694, 98 L.Ed. 884 (1954).

clear denial of plaintiff's constitutional rights.[12]

### D. Defendants do not Enjoy Qualified Immunity

Neither the District nor the individual defendants, insofar as they are sued in their official capacities, may assert a qualified immunity defense under section 1983. *Owen v. City of Independence*, 445 U.S. 622, 638, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673 (1980); *see Will*, 109 S.Ct. at 2311 (a suit against an official in his official capacity is equivalent to a suit against the government itself). Insofar as they are sued personally, however, the individual defendants have properly raised this defense. *See, e.g., Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Nevertheless, because their conduct resulted in the violation of "clearly established ... constitutional rights of which a reasonable person would have known," they are not entitled to qualified immunity. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).[13]

Public officials are charged with "a presumptive knowledge of and respect for 'basic, unquestioned constitutional rights.'" *Harlow*, 457 U.S. at 815, 102 S.Ct. at 2737 (citing *Wood v. Strickland*, 420 U.S. at 322, 95 S.Ct. at 1001). In mid-1987, when Killjoy was implemented, the law clearly required that some predeprivation process be provided in connection with the MPD's four month retention of plaintiff's car. *See Zimmerman Brush*, 455 U.S. at 436, 102 S.Ct. at 1158. Since defendants accorded plaintiff no procedural protections whatsoever, they cannot seriously maintain that their conduct was objectively reasonable. Accordingly, their qualified immunity defense must fail. *See Harlow*, 457 U.S. at 818–19, 102 S.Ct. at 2738–39.[14] Having found defendants liable under section 1983, we now address plaintiff's claim of tortious conversion against the District.

### IV. Plaintiff's Claim of Tortious Conversion

Plaintiff argues that the District is liable for tortious conversion under the doctrine of *respondeat superior.* We agree. The District may be sued for the intentional torts of its employees performing ministerial acts within the scope of their employment. *See Dellums v. Powell*, 566 F.2d 216, 223 (D.C.Cir.1977), *cert. denied*, 438 U.S. 916, 98 S.Ct. 3147, 57 L.Ed.2d 1161 (1978); *Wade v. District of Columbia*, 310 A.2d 857, 863 (D.C.1973).[15] The police officers who recovered the Skylark, failed to notify plaintiff, and placed the vehicle in secret storage were doing just that. *Cf. Dellums*, 566 F.2d at 223 & n. 25 (arrest function is ministerial) (citations omitted); *Wade*, 310 A.2d at 860 (District liable "for assault and battery and/or false arrest and imprisonment" inflicted by police officers) (citations omitted).

The elements of conversion are: (1) an unlawful exercise, (2) of ownership, dominion, or control, (3) of the personal property of another, (4) in denial or repudiation of that person's rights thereto. *See,*

---

**12.** In light of this holding, we find it unnecessary to address plaintiff's substantive due process claim.

**13.** Nor are they entitled to absolute immunity. For executive officials, as well as local police officers, "qualified immunity represents the norm." *Harlow*, 457 U.S. at 807, 102 S.Ct. at 2732. Defendants are not "officials whose special functions or constitutional status requires complete protection from suit." *Id.*

**14.** This holding is significant because punitive damages, while disallowed against the District, are recoverable against the other defendants in their individual capacities. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 267–71, 101 S.Ct. 2748, 2759–62, 69 L.Ed.2d 616 (1981).

**15.** Although plaintiff's motion is deemed unopposed, we note that defendants' opposition fails to support their defense of inadequate notice. *See* D.C.Code § 12–309 ("Actions Against District of Columbia for unliquidated damages; time for notice."). To the contrary, the evidence indicates that proper notice was provided, and that defense counsel was aware of this fact. *See* O'Callaghan Dep. at 61–62.

*e.g., Duggan v. Keto,* 554 A.2d 1126, 1137 (D.C.1989) (citations omitted). We have already held that the police unlawfully kept plaintiff's car from her for almost four months. Clearly, the secret storage constituted control of the car in denial of plaintiff's rights thereto.[16] This is a classic case of conversion that occurred when the police, after lawfully coming into possession of plaintiff's property, thereafter wrongfully refused to surrender it. *See Horne v. Francis I. duPont & Co.,* 428 F.Supp. 1271, 1275 (D.D.C.1977).[17]

### V. *Conclusion*

For the reasons explained above, we hold:

(1) that defendants are "persons" within the meaning of 42 U.S.C. § 1983;

(2) that Operation Killjoy constituted a policy, custom, or usage attributable to the District itself;

(3) that defendants' implementation of Operation Killjoy resulted in a violation of plaintiff's rights secured by the due process clause of the fifth amendment;

(4) that defendants enjoy neither absolute nor qualified immunity, and that therefore the individual defendants are liable both personally and in their official capacities; and

(5) that the District is liable for conversion under the doctrine of *respondeat superior.*

The only remaining issues concern the appropriate measure of damages and the matter of attorney's fees and costs.

An Order consistent with the foregoing has been entered this day.

ORDER

Upon consideration of plaintiff's motion for summary judgment, and the entire record herein, and for the reasons stated in an accompanying Memorandum Opinion entered this day, it is by the Court this 21st day of June, 1990,

ORDERED that plaintiff's motion is granted; and it is

FURTHER ORDERED that counsel for the parties shall appear before the Court for a calendar call on this matter on June 28, 1990, at 9:00 a.m., for the purposes of setting a trial date on the issue of damages.

---

16. While the District could have raised any defenses available to the officers who caused the conversion, *see Wade,* 310 A.2d at 862, it failed to do so. Defendants' opposition, even if we considered it, offers not a scintilla of evidence in support of a qualified immunity defense. *See id.; see also National Life Ins. v. Silverman,* 454 F.2d 899, 908–09 (D.C.Cir.1971). Since the District bears the burden of proof on this matter, *see Wade,* 310 A.2d at 362, summary judgment is proper. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

17. The fact that the police eventually returned the Skylark does not bar plaintiff's action for conversion, "but merely goes to reduce the damages." W. Prosser, The Law of Torts § 15, at 97 (4th ed.1971) (footnotes omitted), *quoted with approval in DeKine v. District of Columbia,* 422 A.2d 981, 986 (D.C.1980).