ATTORNEY FOR APPELLANT ATTORNEYS
 
FOR APPELLEES

STATE OF INDIANA, MARION 
  

Jon Pactor
 COUNTY
 
DEPARTMENT OF PUBLIC

Indianapolis, Indiana
 WELFARE, FAMILY AND SOCIAL

SERVICES ADMINISTRATION,

ELIZABETH SAMKOWSKI, RAY

MARTIN AND PEGGY WEBER

ATTORNEYS FOR APPELLEES 

BRIAN TOEPP AND THE MARION 
Jeffrey Modisett

COUNTY PROBATION DEPARTMENT
 Attorney General of Indiana

Andrew P. Wirick Jon Laramore

Office of Corporation Counsel Deputy Attorney General

Indianapolis, Indiana Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE

LORETTA ROBERTS AND GORDON

CHASTAIN

Stewart & Irwin

Indianapolis, Indiana

Plews & Shadley

Indianapolis, Indiana

IN THE

SUPREME COURT OF INDIANA

J.A.W., )

)

Appellant (Plaintiff Below), )

)

v. )  32S01-9510-CV-1199

)  in the Supreme Court

STATE OF INDIANA, )

MARION COUNTY DEPT. OF PUBLIC )  

WELFARE, et al. )  32A01-9212-CV-415

)  in the Court of Appeals

Appellees (Defendants Below). )

APPEAL FROM THE HENDRICKS SUPERIOR COURT

The Honorable Mary Lee Comer, Judge

Cause NO. 32D01-9004-CPV-277

SHEPARD, Chief Justice.

In April 1990, J.A.W. commenced this action against the County Department of Public Welfare of Marion County ("Marion Department"
(footnote: 1)), various other public entities, and several individuals. He alleged that between 1978 and 1989, the Marion Department failed to protect him from the extreme sexual abuse he suffered in foster care and affirmatively conspired to suppress information about the abuse.  He contends that this behavior violated the Civil Rights Act of 1871, 42 U.S.C. § 1983 (1994).

The Marion Department countered that it was not amenable to suit under § 1983 because it was an arm of the state.  The trial court agreed and granted the Department's motion for summary judgment.  In an interlocutory proceeding, the Court of Appeals reversed, holding that county departments could be sued under § 1983.  
J.A.W. v. State
, 650 N.E.2d 1142 (Ind. Ct. App. 1995).  

The Marion Department petitioned for transfer.  Because this question has generated persistent confusion in the courts,
(footnote: 2) we granted the petition.
(footnote: 3)  We now hold that a 1986 reorganization, Act of Mar. 12, 1986, Pub. L. No. 16-1986, 1986 Ind. Acts 403, rendered the county departments arms of the state for § 1983 purposes.  Consequently, we affirm the trial court's grant of summary judgment.

I.  Who Is Immune?

Section 1983 creates a civil action against any "person" who acts under color of state law to deprive an individual of a federal right.  42 U.S.C. § 1983.  Whether a governmental entity is amenable to suit under that provision depends on the meaning of the term "person."  The U.S. Supreme Court has held that for § 1983 purposes that term does not include a state or its administrative agencies, 
Will v. Michigan Dep't of State Police
, 491 U.S. 58 (1989).  The term does include a state's political subdivisions, like cities and other municipal corporations.  
Monell v. Department of Soc. Serv.
, 436 U.S. 658 (1977).  Because this distinction is a matter of federal statutory interpretation, it is binding on this Court.
(footnote: 4)

In distinguishing state agencies from political subdivisions, the U.S. Supreme Court applies the same methodology for determining whether a governmental entity shares the sovereign immunity of its parent state.  States and their agencies are generally immune from nonconsensual suit in federal court because of either the Eleventh Amendment, 
Pennhurst State Sch. & Hosp. v. Halderman
, 465 U.S. 89 (1984), or implied limitations on Article III of the federal Constitution, 
Seminole Tribe v. Florida
, 116 S. Ct. 1114 (1996); 
Hans v. Louisiana
, 134 U.S. 1 (1890).  Political subdivisions, even though created by some kind of state law charter and generally regulated by the state, do not share that immunity.  
Lincoln County v. Luning
, 133 U.S. 529 (1890); 
see
 
Owen v. City of Independence
, 445 U.S. 622 (1980).  The question is whether "'the state is the real, substantial party in interest'" when the entity is sued.  
Pennhurst
, 465 U.S. at 101 (quoting 
Ford Motor Co. v. Department of Treasury
, 323 U.S. 459, 464 (1945)); 
accord
 
In re Ayers
, 123 U.S. 443, 506 (1887).

The Court's approach to this question has evolved over the years.  The 
Ford Motor
 opinion seemed to propose a situational approach, suggesting that a governmental entity's amenability to suit depended on "the essential nature and effect of the proceeding."  323 U.S. at 464.  In that case, Ford sought reimbursement for taxes that the Indiana treasury department had unconstitutionally collected.  Since any judgment would have operated against the state treasury, the Court held that the state was the real party in interest, even though the treasury department was the normal party.  
Id.

The Burger Court shifted from this situational approach to a categorical one.  In 
Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle
, 429 U.S. 274 (1977), it sought to determine, regardless of the nature of the suit, whether an Ohio school district was a state agency or a political subdivision.  The Court acknowledged that the school district was subject to some state control and received "a significant amount" of financial support from the state.  
Id.
 at 280.  It nevertheless concluded that the district was "more like a county or city than it is like an arm of the State."  
Id.
  In weighing the district's attributes, the Court pointed out that the district was designated as a political subdivision under state law, was "but one of many local school boards within the State," and had "extensive powers to issue bonds and to levy taxes."  
Id.
  (citations omitted).

Two years later, the Court held that a regional planning commission created by an interstate compact between California and Nevada could not assert those states' sovereign immunity.  
Lake Country Estates, Inc. v. Tahoe Regional Planning Agency
, 440 U.S. 391 (1979).  The Court focused on a number of facts:  the states disclaimed any intent to shield the commission from suit; the compact labeled the entity a "political subdivision"; counties appointed a majority of the commission's administrators; counties also provided its funding; the states were not liable for the commission's financial obligations; its primary activity, land-use regulation, was traditionally a local function; and the states could not veto the commission's rules.  
Id.
 at 401-02.  Following 

the consistent thrust of these characteristics, the Court refused to extend sovereign immunity to the commission.

Taken together, 
Doyle
 and 
Lake Country Estates
 suggest that the Court sought to attain, to the extent the record permitted, a holistic understanding of a governmental entity's position and function.  The Court could then use that perspective as a backdrop for making what are sometimes difficult classifications.  However, lower courts took these fact- and context-sensitive opinions and promptly boiled them down to disparate "tests" of anywhere from two to nine "factors."  Alex E. Rogers, Note, 
Clothing State Governmental Entities with Sovereign Immunity:  Disarray in the Eleventh Amendment Arm-of-the-State Doctrine
, 92 Colum. L. Rev. 1243, 1269-71 (1992); 
see also
 
Hess v. Port Auth. Trans-Hudson Corp.
, 513 U.S. 30, 59 (1994) (O'Connor, J., dissenting).  Rogers blamed "conflicting results" arising from the disparate tests on the Supreme Court's opinions, calling them "devoid of guidance with respect to the relative weight or importance of each criterion."  
Id.
 at 1269.
(footnote: 5)  

In 1994, the Court responded to the confusion.  Writing for a majority, Justice Ginsburg expounded at some length upon the methodology for distinguishing administrative from political subdivisions.  
See
 
Hess
, 513 U.S. at 43-51.  Under 
Hess
, determining the status of a public entity became a three-step process.  A court should (1) establish a presumption as to a public entity's status, (2) balance five general "[i]ndicators of immunity," 513 U.S. at 44, and, if these indicators point in different directions, (3) resolve the question in light of the purposes of the Eleventh Amendment.

In 
Hess
, the Court considered the status of the Port Authority of New York and New Jersey, an entity created by interstate compact.  It expressly articulated a rule, originally implied in 
Lake Country Estates
, 440 U.S. at 401, that an interstate compact entity is presumptively 
not
 protected by its parent states' sovereign immunity.  
Hess
, 513 U.S. at 43.  The Court justified this presumption by noting that a suit brought in federal court against one of these entities would not be an affront to the parent states because they had voluntarily transferred slices of sovereignty to an interstate entity whose creation required federal approval.  
Id.
 at 41-42.  The presumption that interstate compact entities are amenable to suit could be overcome if "good reason" existed to think the states had intended to extend sovereign immunity to it.  
Id.
 at 43-44.

The Court has not explicitly articulated a presumption with respect to purely intrastate subdivisions, but 
Hess
 does provide some guidance.  There, the Court reasoned in part that a state's cession of powers to an interstate entity insulated the state from insult when a federal court exercised jurisdiction over the entity.
(footnote: 6)  Similarly, a state is not necessarily insulated if it has intentionally ceded certain powers to a political subdivision over which a federal court later exercises jurisdiction.  The key is whether the state has intended to create a quasi-sovereign political subdivision.  We think the manner in which an entity is classified under state law is the best indicator of such an intent.  Therefore, we will presume that the classification of an intrastate entity for Eleventh Amendment and § 1983 purposes is the same as its classification under state law.
(footnote: 7)

After establishing a presumption, we must balance indicators of immunity to see if they consistently support or contradict the presumptive immunity status.  As we noted above, the Court's opinions in 
Doyle
 and 
Lake Country Estates
 suggest that this balancing involves any relevant attributes that can assist a court in making the classification decision.  In 
Hess
, however, the majority seemed to apply a stricter five-factor test.  Under that  approach, a court should ask the following:

(1) whether the entity performs a traditionally state or local function;

(2) whether the entity is designated as a state agency or political subdivision for state law purposes;

(3) whether the entity was subject to state control or local control;

(4) whether primary funding for the entity was provided by the state or, in contrast, either local government or the entity's own independent revenue-generating capacity; and

(5) whether the state was liable for the entity's debts, including judgments against it.

See
 513 U.S. at 44-46.  By examining these indicators, a court seeks to determine whether the legislature intended to render an entity immune from federal suit.  

If the presumption and the balancing of indicators are consistent, the inquiry ends.  
See
 
Lake Country Estates
, 440 U.S. at 402.  If these indicators "point in different directions," 
Hess
, 513 U.S. at 47, a court must further evaluate the entity’s status in light of the dual concerns that animate the Eleventh Amendment: "the State’s solvency and dignity," 
id.
 at 52.  These considerations may ultimately make the fifth indicator, state liability for the public entity, determinative.
(footnote: 8)

The concern for state solvency focuses directly on threats to the state treasury.  A court must ask, "If the expenditures of the enterprise exceed receipts, is the State in fact obligated to bear and pay the resulting indebtedness of the enterprise?"  
Id.
 at 51.  "When the answer is 'No'--both legally and practically--then the Eleventh Amendment’s core concern is not implicated."  
Id.
  Presumably, when the answer is "Yes"--legally or practically--the entity should be deemed an arm of the state.

The matter of state dignity is more difficult to quantify.  The Court has observed that states retain "attributes of sovereignty" and are entitled to respect as "members of the federation."  
Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.
, 506 U.S. 139, 146 (1993).  Immunity from suit is an element of that sovereignty.  
Id.
  According to the Court, a state’s dignity is threatened if a private party is able to subject a state, without its consent, to compulsory judicial processes.  
In re Ayers
, 123 U.S. 443, 505 (1887).  This notion of dignity does not itself tell us which entities are state agencies entitled to share that dignity.

Nevertheless, the key issue underlying dignity seems also to be state liability.  In 
Ayers
, the Court reasoned that in order fully to affirm state dignity, it would have to extend sovereign immunity to any suit "where the state, though not named as such, is, nevertheless, the only real party against which alone in fact the relief is asked, and against which the judgment or decree effectively operates."  
Id.
 at 506.  In the case of injunctive relief, the affront would seemingly involve a federal court instructing a state to control a public entity in a particular manner.  We shall now apply the 
Hess
 three-step process to the county departments.

II.  County Department of Public Welfare

There has been some ambiguity about the nature of the county departments.  Their many duties
(footnote: 9) make them fundamental components of the State’s human services system, and the State Department of Public Welfare has always had authority to oversee their operation.
(footnote: 10)  At the same time, county departments have always relied on county governments to manage their money.
(footnote: 11)  In still other respects, county departments have possessed a measure of autonomy.
(footnote: 12) 

Relying heavily on 
Mackey
 and focusing on financing, J.A.W. contends that when he commenced this action in 1990, the Marion Department was "a separate county-funded entity addressing separate and distinct county concerns."  (Appellant’s Reply Br. at 4.)  Representing the Department, the Attorney General disagrees, stressing the 1986 restructuring of the county departments in arguing that they were state agencies long before J.A.W. filed suit.

To resolve this controversy, we must weigh the relevant legal attributes of the county departments according to the 
Hess
 methodology.  Because those attributes are matters of state law,
(footnote: 13) we have final authority to define their substance, as distinguished from their § 1983 import.  Thus, we must apply a federal standard of review to state law "facts" that we may conclusively "find."

A.  State Law Classification

In applying the 
Hess
 methodology, we begin by presuming that the classification of an intrastate entity under § 1983 is the same as its classification under state law.  Indiana law distinguishes the state and its agencies from its "political subdivisions."  
See
 Ind. Code Ann. § 36-1-2-13 (West 1997) (local government code); 
id.
 § 34-4-16.5-2(c), (f) (tort claims act).  Political subdivisions may be either "special taxing districts" or "municipal corporations," 
id.
 § 36-1-2-13; 
see also
 
id.
 § 34-4-16.5-2(f)(6), -2(f)(5), respectively, and the latter category includes not only counties and cities but also specialized entities like school districts.  Ind. Code Ann. § 36-1-2-10 (West 1997).

1.  Classification Before 1986.
  The Social Security Act, ch. 531, 49 Stat. 620 (1935), required that states participating in its federally subsidized programs establish a state agency to either directly "administer" the programs or "supervise" their administration by "political subdivisions."  Social Security Act, §§ 2, 402, 1002, 49 Stat. at 620, 627, 645.  The Indiana legislature chose the decentralized option in the Welfare Act of 1936, ch. 3, 1936 Ind. Acts 12.  The state act created the county departments, 
id.
 § 18, 1936 Ind. Acts at 25, and charged them with "administration" of most of the programs, 
id.
 § 21, 1936 Ind. Acts at 29.
(footnote: 14)  The act also created the State Department, 
id.
 § 2, 1936 Ind. Acts at 14, with the authority to "administ[er] or supervis[e] . . . all public welfare activities of the state," 
id.
 § 5, 1936 Ind. Acts at 16.  Most significantly, the Act obligated the State Department to "organiz[e] and supervis[e]" the county departments as a service "to county governments."  
Id.
 § 5(f), 1936 Ind. Acts at 17.  It vested direct governance of the county departments in local bodies, county boards of public welfare ("county boards").  
Id.
 § 18, 1936 Ind. Acts at 25.

The influence of the federal act is manifest.  We think the grant of "supervisory" power to the State Department demonstrates legislative intent to establish a system of decentralized administration by political subdivisions anticipated by the federal act.  Because the relationship between the State Department and the county departments remained relatively unchanged over the ensuing fifty years, we conclude that 
for state law purposes
, the county departments were 
not
 administrative arms of the state before the 1986 restructuring.

Principles of agency are relevant in considering whether the county departments were arms of the counties or separate political subdivisions under state law.  County governments have never had significant authority over the daily operations of county departments.  For instance, county governments had no authority to review a department’s approval of aid to a client.  Ind. Code Ann. § 12-1-3-9 (West 1982) (repealed 1992).  Before 1986, county governments were responsible for the administrative expenses of the county departments, 
id.
 § 12-1-11-3(a), including facilities, 
id.
 § 12-1-3-4(b), but not even in these matters did county governments possess unfettered discretion.  
See
 
County Council v. Department of Pub. Welfare
, 400 N.E.2d 1187 (Ind. Ct. App. 1980) (holding county government could not control number of employees of county department) [hereinafter 
Bartholomew Council
].

County governments have had a role in managing the financial affairs of the county departments, but their duties have been largely ministerial.  Before 1986, the expenses of each county department were paid from a separate county welfare fund.  That fund was composed of state and federal grants combined with revenue from a distinct county property tax, levied annually "in an amount . . . necessary to raise the portion of such fund which the county is obliged to raise."  Ind. Code Ann. § 12-1-11-1 (West 1982) (repealed 1992).  Each year, a county department and board adopted a budget and recommended a tax levy, which were submitted to the county government "for consideration" after approval by the State Department.  
Id.
 § 12-1-11-2.  The county council had a legal duty to make necessary annual appropriations from the county welfare fund "to maintain the welfare services of the county and to defray the cost of the administration of such services."  
Id.
 § 12-1-11-3(a).  The council was also obligated to levy the county welfare tax in an amount necessary to cover the appropriations.  
Id.
  Counties also had a continuing obligation to make additional appropriations or borrow money to cover deficits that arose in their respective county departments.  
Id.
 § 12-1-11-3(b).  County governments had little real discretion in these matters.

Although a county government had some authority to deviate from the budget and recommended tax levy, 
see
 
id.
 § 12-1-11-4; 
Newsom v. Pennsylvania Railroad Co.
, 133 Ind. App. 582, 181 N.E.2d 240 (1962), its discretion was sharply circumscribed by the legal obligation to support local welfare services adequately, 
see
 § 12-1-11-3(a) (using mandatory language); 1950 Op. Att'y Gen. 201, 202; 1947 Op. Att'y Gen. 288, 291.  A county board could--and at the request of the State Department was required to--appeal any deviations to the state board of tax commissioners.  
Id.
 § 12-1-11-4.  Indeed, we once held that a county government lacked standing to challenge an order of the state board of tax commissioners adjusting the appropriation or tax levy.  We concluded that a county government was essentially an agent through which the public welfare tax was collected, and local taxpayers, not the county government, were the real parties in interest in controversies involving tax.  
City of Indianapolis v. Indiana State Bd. of Tax Comm'rs
, 261 Ind. 635, 638-39, 308 N.E.2d 868, 870 (1974).  Furthermore, taxes levied "[t]o meet the requirements of the county welfare fund" have not been included in the calculation of a county's maximum permissible level of taxation.  Ind. Code Ann. § 6-1.1-18-3(b)(6) (West 1989 & Supp. 1997).  In light of the limited measure of control that county governments could exercise over the county departments, we conclude as a matter of state law that the county departments were 
not
 arms of county governments before the 1986 restructuring.

We believe the county departments would have been most appropriately classified as municipal corporations before the 1986 restructuring.  Under Indiana law, a "municipal corporation" is defined as any

[county, city, town, township], school corporation, library district, local housing authority, fire protection district, public transportation corporation, local building authority, local hospital authority or corporation, local airport authority, special service district, or 
other separate local governmental entity that may sue and be sued
.

Ind. Code Ann. § 36-1-2-10 (West 1997) (emphasis added).  The county departments are not enumerated in this list, nor has the public welfare code ever expressly declared them to be municipal corporations.
(footnote: 15)  Nevertheless, we think they would have qualified under the catch-all phrase before 1986.

Under the catch-all phrase, a local governmental entity is a municipal corporation if it can litigate in its own name and if it is "separate" from other local entities.  Like the enumerated entities,
(footnote: 16) the county departments possessed the right to sue and be sued.
(footnote: 17)  Moreover, our analysis of the relationship between the county departments and county governments suggests that the county departments were separate local governmental entities.

Other reasoning supports our conclusion that the county departments were "separate" local governmental entities before 1986.  We have held that in determining whether an entity is a municipal corporation, we must consider whether the legislature has intended the entity to exercise limited sovereign powers, 
Joint County Park Bd. v. Stegemoller
, 228 Ind. 103, 113, 88 N.E.2d 686, 690 (1949) (quoting 
Brinkmeyer v. City of Evansville
, 29 Ind. 187, 191 (1867)).

In addition to exercising discretion in making awards of public assistance and carrying out other human services functions, the administrative structure of the county departments suggested that the legislature intended them as distinct entities.  Before 1986, the county departments were administered by the county boards.  The members of those boards were appointed and removable for cause only by the local circuit court, Ind. Code Ann. § 12-1-3-2(a), (d) (West 1982) (repealed 1986);
(footnote: 18) they had to be county residents, 
id.
 § 12-1-3-2(a)(1); and they could not simultaneously hold any elective county position, 
id.
 § 12-1-3-2(a)(4).  This Court held that members of the county boards were public officers, not county employees.  
State ex rel. Newkirk v. Sullivan Circuit Court
, 227 Ind. 633, 637, 88 N.E.2d 326, 327-28 (1949).  Each board had immediate administrative authority over its respective county office
(footnote: 19) and appointed its director.
(footnote: 20)  This structure suggests the legislature went to great pains to insulate the county departments--and the public welfare system--from control by other local governmental entities.

We are also aided by the doctrine of 
ejusdem generis
,
(footnote: 21) which invites us to compare the county departments to the enumerated municipal corporations.  The enumerated entities exhibit some common attributes of limited sovereignty.
(footnote: 22)  As noted above, they may sue and be sued in their own names.
(footnote: 23)  They also possess at least limited contractual authority.
(footnote: 24)  Some may also acquire, hold, or transfer property
(footnote: 25) and exercise the power of eminent domain.
(footnote: 26)  Finally, municipal corporations almost always have authority to raise revenue, whether by levying taxes, collecting fees, issuing bonds, or borrowing funds.
(footnote: 27)  The oversight authority of local governmental units is generally limited to creating the municipal corporations and appointing their administrators.
(footnote: 28)  Local governmental units also have authority to review fiscal operations of some municipal corporations.
(footnote: 29)

Before 1986, the county departments generally fit this model of the municipal corporation.  Although the public welfare code contained no broad charter of enumerated powers, it did grant the departments a few attributes of limited sovereignty.  They could sue and be sued in their own name.  Ind. Code Ann. § 12-1-3-6(a) (West 1982) (repealed 1992).  They also had some limited contractual and property rights.
(footnote: 30)  Moreover, the fiscal powers of the county departments were similar to those of fire protection districts, 
see
 Ind. Code Ann. § 36-8-11-18 (West 1997), county building authorities, 
see
 
id.
 § 36-9-13-35, and airport authorities, 
see
 
id.
 § 8-22-3-23 (West Supp. 1997).  Finally, county departments possessed "all other rights and powers . . . necessary to administer" their human services responsibilities, 
id.
 § 12-1-3-6(a) (West 1982) (repealed 1992).  Although the county departments differed from other municipal corporations in that their powers were subject to rules promulgated by the State Department, 
id.
 § 12-1-3-4(a), this supervision was necessary to meet the requirements of the Social Security Act.

Therefore, we hold as a matter of state law that the county departments were classified as municipal corporations under Indiana law before 1986.  In applying the 
Hess
 standards, we will presume 

that the county departments would also have been deemed municipal corporations under § 1983 before the restructuring.

2.  Classification After 1986.
  The 1986 amendments to the public welfare code radically changed the administrative structure of the county departments.  They abolished the county boards, made the employees of the county departments full-fledged state employees, altered the method of financing operating expenses, and transferred the property of the county departments from county to state ownership.  These significant changes persuade us that the legislature intended to abandon the decentralized structure it had adopted in 1936.  The legislature effectively transformed county departments into subordinate units of the State Department.

Perhaps the most telling change was the abolition of the county boards, which had provided the only mechanism for local control of the county departments.  The 1986 amendments eliminated the county boards as they had previously existed, 
see
 1986 Amends., § 84, 1986 Ind. Acts at 471 (repealing § 12-1-3-2).
(footnote: 31)  The more 

significant powers of the county boards were transferred to either the State Department,
(footnote: 32) or the county departments.
(footnote: 33)

Before the 1986 amendments, employees of the county departments were in some vague sense shared employees of the state and county.
(footnote: 34)  For instance, although each county board appointed the director of its respective county department
(footnote: 35) and reviewed the director’s hiring decisions,
(footnote: 36) the State Board of Public Welfare could remove the director for cause and, if the county board refused to appoint a successor, could appoint one itself.
(footnote: 37)  In addition, the county director and other employees of a department had to be selected from candidates on state personnel lists.
(footnote: 38)  In fact the definition of "state service" in the State Personnel Act has always included the director and employees of the county departments.
(footnote: 39)  The were entitled to compensation according to state salary schedules,
(footnote: 40) and county governments could be forced to appropriate funds to provide those levels of pay, 
County Council v. Monroe County Bd. of Pub. Welfare
, 402 N.E.2d 1285 (Ind. Ct. App. 1980) [hereinafter 
Monroe Council
]; 
Bartholomew Council
, 400 N.E.2d 1187 (Ind. Ct. App. 1980).  Furthermore, the state had a duty to reimburse counties for half of the costs of retirement contributions for county office employees
(footnote: 41) and to provide fringe benefits consistent with state personnel rules if counties failed to do so, 
State Employees' Appeals Comm'n v. Brown
, 436 N.E.2d 321 (Ind. Ct. App. 1982).

The 1986 amendments clarified this muddled employment status.  With the abolition of the county boards, the State Department was empowered to appoint the directors of the county departments
(footnote: 42), and to approve the directors hiring decisions.
(footnote: 43)  The enactment also added the county directors and employees to the state employees retirement system
(footnote: 44) and deleted language requiring partial state reimbursement to counties for retirement contributions.
(footnote: 45)  

The restructuring also altered the financing of the county departments.  Before 1986, the county governments were solely responsible for administrative costs, 
see
 Ind. Code Ann. § 12-1-3-9 (West 1982) (repealed 1992), including facilities, 
id.
 § 12-1-3-4(b).  In the 1986 amendments, the legislature created a new structure for covering administrative costs.  It created a new public welfare tax, to be collected by the counties and forwarded to the state welfare fund on a monthly basis.  Ind. Code Ann. ch. 12-1-11.1 (West Supp. 1991) (repealed 1992).  The State Department assumed responsibility for the administrative costs of the county departments, including facilities.  § 12-1-3-8 (West Supp. 1991) (repealed 1992).  Title to all the property of the county departments was also transferred from the counties to the State Department.  1986 Amends., § 82(c), 1986 Ind. Acts at 471.  With regard to administrative expenses, county governments were largely rendered tax collectors for the State Department.

These significant structural changes clearly reflect a legislative desire to centralize management of the public welfare system in the State Department.  Consequently, we will presume that the county departments were political subdivisions under § 1983 before the 1986 amendments and arms of the state afterwards.

With these presumptions established, we now apply the remaining 
Hess
 criteria.

C.  The 
Hess
 Criteria

While we presume that an entity’s classification under § 1983 mirrors its classification under state law, we must test that presumption with the specific inquiries established in 
Hess
.  If these inquiries produce a consistent result, our analysis is at an end.  If not, we must further analyze the entity at issue in light of the purposes of the Eleventh Amendment.  Our ultimate quest is to determine whether the legislature intended to extend sovereign immunity to the entity.

The first inquiry is whether the entity performs a traditionally state or local function.  In this case, we cannot say that providing public assistance and other social services readily fits into either category.  As we noted above, the Social Security Act allowed states to vest administration of its programs in either a state agency or political subdivisions.  This inquiry neither advances our understanding of the § 1983 status of the county departments nor casts doubt on our presumptions.

The second inquiry is whether the entity is subject to state or local control.  As we concluded above, the county departments have been subject to a significant measure of state oversight since their inception in 1936.  That measure of control would have been sufficient, under ordinary circumstances, to support the inference of an agency relationship between the county departments and the State Department.  We might conclude, then, that the control inquiry supports the proposition that the county departments have always been arms of the state for § 1983 purposes.

But the control inquiry cannot proceed in a vacuum.  In 1936, our legislature chose to set up as decentralized a system as the Social Security Act permitted.  The legislature created the county departments as distinct municipal corporations and provided for local appointments of not only the directors of the county departments but also the members of the county boards.  The county departments approved grants of public assistance and provided other client-level human services.  The Social Security Act required that if states chose to allow political subdivisions to administer programs in this way, the states had to retain supervisory authority.  To view that supervision as 
necessarily
 transforming a political subdivision into an arm of the state would contradict the Social Security Act's offer of a choice between centralized and decentralized administration and would render the Act's use of the term "political subdivision" somewhat superfluous.  We are unwilling to adopt that view.

Although the State Department possessed supervisory control over the county departments before 1986, that control does not imply an extension of sovereign immunity, for the supervision was mandated under the Social Security Act's option for decentralized administration.  The increased level of state control established in 1986, however, is a relevant indicator of legislative intent to draw the county departments under the state's umbrella.  The control inquiry produces a result that is fully consistent with our presumption that the county departments were political subdivisions under § 1983 until the 1986 restructuring made them arms of the state.

The third inquiry is whether funds for the entity are provided by the state or, in contrast, by either local government or the entity's own independent revenue-generating capacity.  As we explained above, each county department is supported by a county welfare fund.  Although a significant amount of revenue for this fund comes from the county welfare tax, the fund also benefits from substantial grants from the federal and state governments.
(footnote: 46)  The diversity of funding sources reflects the obvious fact that public welfare activities in Indiana were intended to be cooperative endeavors among federal, state, and local governments.  This inquiry does not significantly contribute to our ability to classify the county departments as state or local entities.  The  funding scheme is not necessarily inconsistent with our presumption.  Furthermore, to the extent the state assumed an even greater financial role in the 1986 restructuring, the funding scheme supports the notion that the county departments became arms of the state at that time.

Finally, we must consider whether the state was liable for the debts of the county departments, especially judgments against them.  Both before and after the 1986 restructuring, the counties were legally responsible for many of the debts of the county departments.  Awards of public assistance and other expenses related to providing human services constituted claims against the counties both before and after the amendments.  
See
 Ind. Code Ann. §§  12-1-3-9 (West 1982 & Supp. 1991) (repealed 1992).  Also, the 1986 act expressly provided that it did not free the counties of their obligations to support bonds and loans they had issued to cover shortfalls in county department budgets.  1986 Amends., § 80(a), 1986 Ind. Acts at 469-70.  On the other hand, while claims relating to the administrative expenses were county obligations before the 1986 amendments, 
see
 §§ 12-1-3-9, 12-1-11-3(a) (West 1982) (repealed 1992), the responsibility for paying those costs was transferred to the state in the restructuring, 
see
 
id.
 §§ 12-1-3-8(a) (West Supp. 1991) (repealed 1992).
(footnote: 47)

Courts holding that the county departments were arms of the counties and amenable to suit under § 1983 have focused on these fiscal obligations of the county governments.  
See
 
Baxter v. Vigo County Sch. Corp.
, 26 F.3d 728, 732-33 (7th Cir. 1994); 
Mackey v. Stanton
, 586 F.2d 1126, 1130-31 (7th Cir. 1978), 
cert. denied
, 444 U.S. 882 (1979).  We think those courts gave too little weight to our prior construction of Indiana law in attributing such significance to these fiscal matters.  Claims involving the county departments--whether for public assistance or pre-1986 administrative costs--were payable only from the county welfare fund.  
See
 Ind. Code Ann. § 12-1-11-3(a) (West 1982 & Supp. 1991) (repealed 1992).  Moreover, the counties issued bonds or obtained loans under the public welfare code only in order to provide 
advances
 to the county welfare fund.  
Id.
 § 12-1-11-3(b).  Underlying these functions was a legal obligation of counties to support county welfare activities.  As to management of the county welfare fund, we indicated in 1974 that the county governments were  virtually financial agents of the autonomous county departments.   
See
 
City of Indianapolis v. Indiana State Bd. of Tax Comm'rs
, 261 Ind. 635, 638-39, 308 N.E.2d 868, 870 (1974).  When the county departments were transformed into subordinant agencies of the states in 1986, the county governments became--with respect to these activities--financial agents of the state.  We so hold as a matter of state law.

We reach a similar result with respect to judgments rendered against a county department.  Before the 1986 restructuring, the public welfare code provided that none of the officers or employees of the State Department or the county departments could be held personally liable, "except to the 
state of Indiana or the county
 for any official act done or omitted in connection with the performance of their respective duties under the provisions of this act."  Ind. Code Ann. § 12-1-4-3 (West 1982) (emphasis added) (repealed 1992).  Given this kind of indemnification scheme, either the state or the counties could be held liable for judgments rendered against the county departments before 1986.

However, the state and the counties were not jointly and severally liable.  The Welfare Act established the county departments as municipal corporations, but, again, the Social Security Act required that the state retain supervisory authority.  We think this structural oxymoron had implications for liability.  The very existence of supervisory authority might lead one to conclude that the state should have been held strictly or vicariously liable for the official misconduct of a county department.  But that result would contradict the status of the county departments as municipal corporations and would eliminate any need for the 
county
 indemnification permitted under § 12-1-4-3.  

The 1986 amendments swept away this tension.  They made the county departments subordinate arms of the State Department and deleted the authority for county indemnification.  1986 Amends., § 17, 1986 Ind. Acts at 422; Ind. Code Ann. § 12-1-4-3 (West Supp. 1991) (repealed 1992).  Any misconduct by the county departments became directly attributable to the state.  Even if the misconduct involved a denial of public assistance--and would consequently be compensated from the county welfare fund--management of the county welfare fund became a state function.  In fact, we think just as title to the property of the county departments was transferred to the state in 1986, so the county welfare funds effectively became special pools of state money.  We so hold as a matter of state law.

In summary, we conclude that under state law before the 1986 amendments, the county departments were responsible for certain debts and the state was likely liable for others.  After 1986, the state, operating through the county departments and county governments, became responsible for all public welfare debts and judgments against the county departments.

This result is generally consistent with our presumption that the county departments were amenable to suit under § 1983 until the 1986 amendments took effect.  The only contradiction involves those instances in which the state might have been liable for a judgment before the restructuring.  Excluding that contradiction, all the 
Hess
 factors converge to support our presumption.

III.  Conclusion

When J.A.W. sued the Marion Department in 1990, it was an entity entitled to immunity under the Eleventh Amendment.  The trial court properly entered summary judgment for the department. 

Dickson, Selby, and Boehm, JJ., concur.

Sullivan, J., not participating.

FOOTNOTES
1: In 1993, the county departments of public welfare ("county departments") were renamed county offices of family and children.  
See generally
 Act of April 12, 1993, Pub. L. No. 4-1993, § 1, 1993 Ind. Acts 1283, 1284; Act of April 12, 1993, § 13, Pub. L. No. 5-1993, 1993 Ind. Acts 1472, 1481 (redundant amendments).  For the purposes of this opinion we shall continue to refer to them as county departments.  

2: 
Compare
 
Baxter v. Vigo County Sch. Corp.
, 26 F.3d 728 (7th Cir. 1994) (holding county departments to be "persons" under § 1983), 
and
 
Mackey v. Stanton
, 586 F.2d 1126 (7th Cir. 1978), 
cert. denied
, 444 U.S. 882 (1979) (same), 
with
 
McCrum v. Elkhart County Dep't of Pub. Welfare
, 806 F. Supp. 203 (N.D. Ind. 1992) (holding county departments not "persons" under § 1983).  
Cf.
 
County Dep't of Pub. Welfare v. Stanton
, 545 F. Supp. 239 (N.D. Ind. 1982) (holding county department to be agency of state government); 
Snyder v. Mouser
, 149 Ind. App. 334, 340-41, 272 N.E.2d 627, 631 (1971) (discussing county department immunity from tort suit); 
Watson v. Department of Pub. Welfare
, 130 Ind.App. 659, 662-63, 165 N.E.2d 770, 772 (1960) (discussing state's interest in county departments).

3: Although J.A.W. asserted a number of claims against a variety of defendants, most of the claims and defendants have been either dismissed or are not involved in this appeal.  For a fuller statement of the case see the opinion below, 650 N.E.2d at 1146-47 & n. 1.  The Court of Appeals decided a number of issues.  
See
 
id.
 at 1145-46.  Nevertheless, only the Marion Department petitioned for transfer, and it sought review of only the § 1983 issue.  No other party, including J.A.W., challenged this or any other portion of the decision of the Court of Appeals.  In fact, the remaining active defendants have asked us to limit review to the issue presented by the Marion Department.  We grant that request and summarily affirm the disposition of the Court of Appeals as to all matters except the amenability of the Marion Department to suit under § 1983.  Ind.Appellate Rule 11(B)(3).

4: In recognizing this distinction in 
Will
, the Court did not reason from the historical purposes of the Civil Rights Act of 1871, as it has done in other cases construing the scope of § 1983.  
Compare
 
Will
, 491 U.S. at 64-70, 
with
 
Ngiraingas v. Sanchez
, 495 U.S. 182, 187-89 (1990), 
and
 
District of Columbia v. Carter
, 409 U.S. 418, 421-31 (1973).  
Cf.
 
 United States v. Price
, 383 U.S. 787, 801-05 (1966) (construing Enforcement Act of 1870, 16 Stat. 140 (codified at 18 U.S.C. § 241)).  Nevertheless, a brief examination of "the events and passions of the time," 
Price
, 383 U.S. at 803, does not contradict the recognition of this distinction.

For a short time after the Civil War, "'radical' Republicans dominated the governments of the Southern States and [African Americans] played a substantial political role."  
Price
, 383 U.S. at 804.  In response, the Ku Klux Klan and other terrorist groups launched "a wave of murders and assaults . . . designed to keep [African Americans] from the polls" and "[t]he States . . . were helpless, despite the resort by some of them to extreme measures such as making it legal to hunt down and shoot any disguised man."  
Id.
   In 1869, Congress approved the Fifteenth Amendment; ratified in 1870, it extended to African Americans the right to vote.  Section 1983 was enacted a year later.  It is plausible that Congress saw the state governments as potential allies if the federal government sufficiently protected ballot access so that African Americans and liberal Republicans could retain control of the state governments.  The main impediment to equal voting rights was local violence in discrete communities in the South.  
See
 
Carter
, 409 U.S. at 428-29.

In § 1983, Congress sought to combat this evil with a damages action.  Perhaps the belief was that if local taxpayers were financially accountable for the abuses of local government, the increased taxes that might be necessary to pay cumulative damage awards might persuade local community leaders, particularly tax-paying landowners, to oppose and suppress the terrorism.  In fact, Congress seriously considered an additional provision that would have imposed strict liability on municipalities for "damage done to the person or property of its inhabitants by 
private
 persons 'riotously and tumultuously assembled.'"  
Monell
, 436 U.S. at 664.  This amendment suggests that Congress was keenly aware of the possibility of influencing the local balance of power by forcing the socially and economically privileged to internalize the costs of violent white supremacy.  
See
 
id.
 at 667 n. 16 ("'Let the people of property in the southern States understand that if they will not make the hue and cry and take the necessary steps to put down lawless violence in those States their property will be holden responsible, and the effect will be most wholesome.'"  (quoting Cong. Globe, 42d Cong., 1st Sess. at 761 (1871) (statement of Sen. Sherman))).

In contrast, Congress might not have had statewide liability in mind.  They may have hoped Republicans could retain control of state government if the democratic process were preserved.  Furthermore, statewide liability might have been thought less effective because costs would be spread over the entire population of the state.  Individual taxpayers would be less readily able even to identify, much less influence, a public official acting in another part of the state.  Thus, the historical record suggests that the distinction between states and municipalities might not have been inconceivable.

5: Rogers's criticism may have been too harsh.  He cites just three occasions when courts of different jurisdictions have classified the same public entity inconsistently.  In the highest profile incident, the Second and Third Circuits split over the status of the Port Authority of New York and New Jersey, an interstate compact entity.  
Compare
 
Feeney v. Port Auth. Trans-Hudson Corp.
, 873 F.2d 628 (2d Cir. 1989) (denying Eleventh Amendment immunity), 
aff'd on other grounds
, 495 U.S. 299 (1990), 
with
 
Port Auth. Police Benevolent Ass'n v. Port Auth.
, 819 F.2d 413 (3d. Cir.), 
cert. denied
, 484 U.S. 953 (1987) (finding Eleventh Amendment immunity), 
abrogation noted in
 
Hess
, 513 U.S. at 34.

6: 
But see
 
Pillsbury Co., Inc. v. Port of Corpus Christi Auth.
, 66 F.3d 103, 104 (5th Cir. 1995), 
cert. denied
, 116 S. Ct. 1705 (1996) (viewing 
Hess
 as "a limited holding addressing the standard to be applied to bi-state entities not created pursuant to state statute").

7: The Court itself began its analysis in 
Doyle
 by pointing out that Ohio had designated school districts as "political subdivisions" under state law.  429 U.S. at 280.

8: This was the explicit view of the dissenters in 
Hess
, 
see
 513 U.S. at 55, 59-62 (O’Conner, J., dissenting), and the implicit view of the majority, 
see
 
id.
 at 48 & n.19 (opinion of Court). 

9: The county departments provide public assistance and services to dependent children, seniors, and person with disabilities; regulate the care and treatment of abused, neglected, or dependent children and children with disabilities; administer the licensing of foster family homes and supervise the care and treatment of children in foster family care; and handle "other welfare activities that are delegated to it by the state department of welfare."  Ind. Code Ann.  § 12-1-3-4(a) (West Supp. 1991) (repealed 1992). 

10: 
See, e.g.
, Ind. Code Ann. § 12-1-2-2(b), - 2(d), (West 1982) (granting state board of public welfare limited oversight authority) (repealed 1992); 
id.
 § 12-1-2-3(e) (West Supp. 1991) (providing for supervision of county departments by state department) (repealed 1992); 
id.
 § 12-1-3-4(a) (binding county departments to "rules prescribed by the state department") (repealed 1992). 

11: 
See generally
 Ind. Code Ann. chs. 12-1-11, -11.5 (West 1982 & Supp. 1991) (providing for involvement of county governments in financial affairs of county departments) (repealed 1992).

12: 
See, e.g.
, Ind. Code Ann. § 12-1-3-6(a) (West Supp. 1991) (granting county departments capacity to litigate in own names) (repealed 1992); 
id.
 § 12-1-3-1 (West 1982) (providing for administration of county departments by county boards of public welfare, not county executives) 
(amended 1983, 1986; repealed 1992) 
. 

13: The legislature has acted on the topic of county departments three times in recent years.  
See
 Act of Mar. 12, 1986, Pub. L. No. 16-1986, 1986 Ind. Acts 403 [hereinafter 1986 Amends.]; Act of May 12, 1991, Pub. L. No. 9-1991, 1991 Ind. Acts 905 [hereinafter 1991 Amends.]; Act of Feb. 14, 1992, Pub. L. No. 2-1992, 1992 Ind. Acts 177 [hereinafter 1992 Amends.].  We may dispense with the 1991 and 1992 amendments easily.  Both statutes had savings clauses, providing that any rights of liabilities accrued, violations committed, or proceedings commenced before their effective dates were not affected and should be enforced under prior law as if the revisions had not been enacted.  1991 Amends. § 135, 1991 Ind. Acts at 1042; 1992 Amends., § 905(b), 1992 Ind. Acts at 1272.  Because all the relevant events in this case occurred before these amendments took effect, the enactments--by their own command--must be treated for today's purposes as though they never occurred.  The central legislative event is thus the 1986 enactment.

14: Formerly codified at Ind. Code Ann. § 12-1-3-4 (West 1982).  The State Department exercised more direct control over some programs, while the county departments primarily administered others.  
Compare
 Welfare Act, pt. III, arts. I, III, 1936 Ind. Acts at 34-44, 52-57 (formerly codified at Ind. Code Ann. chs. 12-1-5, -7 (West 1982)) (providing for primary administration of assistance to seniors and dependent children by county departments), 
with
 
id.
, art. II, 1936 Ind. Acts at 44-52 (formerly codified at Ind. Code Ann. ch 12-1-6 (West 1982)) (providing for primary administration, including disbursements, of assistance to persons with visual impairments by State Department). 

15: Legislation authorizing the establishment of municipal corporations frequently includes an explicit declaration of their status.  
See, e.g.
, Ind. Code Ann. § 20-14-2-2(a) (West 1995) (library districts); Ind. Code Ann. § 36-8-11-16 (West 1997) (fire protection districts).  However, we have held that "[n]o particular form of words is necessary to constitute a municipal corporation, though a particular form of words is generally used for such purpose."  
Rosencranz v. City of Evansville
, 194 Ind. 499, 504, 143 N.E. 593, 595 (1924).

16: 
Ind. Code Ann. § 20-5-2-2(1) (West 1995) (school corporations); 
id.
 § 20-14-2-2(a) (West 1995) (library districts); 
id.
 § 36-7-18-15(1) (West 1997) (local housing authorities); 
id.
 § 36-8-11-15(a)(11) (fire protection districts); 
id.
 § 36-9-4-36 (public transportation corporations); 
id.
 § 36-9-13-22(a)(4) (county building authorities); 
id.
 § 5-1-4-10(d) (West Supp. 1997) (hospital authorities); 
id.
 §§ 16-22-8-6(b)(1), -34(a)(1) (West 1997) (hospital corporations); 
id.
 § 8-22-3-11(1) (West Supp. 1997) (airport authorities).

17: Ind. Code Ann. § 12-1-3-6(a) (West 1982) (repealed 1992).

18: 
In 1983, the General Assembly transferred appointment and removal power to county commissioners.  Act of April 22, 1983, Pub. L. No. 7-1983, § 13, 1983 Ind. Acts 118, 133.

19: 
Ind. Code Ann. § 12-1-3-1 (West 1982) (amended 1983, 1986; repealed 1992).

20: 
Ind. Code Ann. § 12-1-3-3 (West 1982) (amended 1983, 1986; repealed 1992).

21: Black's Law Dictionary 517 (6th ed. 1990) ("In the construction of laws . . . , the 'ejusdem generis rule' is, that where general words follow an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned.")

22: Legislation authorizing the creation of municipal corporations often contains a list of enumerated powers that includes many of these attributes of limited sovereignty.  
See, e.g.
, Ind. Code Ann. § 20-5-2-2 (West 1995) (school corporation); 
id.
 § 36-9-13-22(a) (West 1997) (county building authorities).

23: 
See
 
supra
 note 12.

24: 
See, e.g.
, Ind. Code Ann. § 36-7-18-15 (West 1997) (local housing authorities); 
id.
 §§ 36-9-4-29, 33 (public transportation corporations).

25: 
See, e.g.
, Ind. Code Ann. § 36-9-13-22(a)(5) (West 1997) (county building authorities); 
id.
 §§ 16-22-8-6(b)(3), -34(a)(11) (hospital corporations).

26: 
See, e.g.
, Ind. Code Ann. § 20-5-23-1 (West 1995) (school corporations); 
id.
 § 8-22-3-14(b), 15 (West 1982 & Supp. 1997) (airport authorities).

27: 
See, e.g.
, Ind. Code Ann. §§ 20-5-2-2(13), -4-1, -4-5 (West 1995) (school corporations); 
id.
 §§ 20-14-3-8(2) to (5), -3-10 (library districts).  

28: 
See, e.g.
, Ind. Code Ann. § 20-14-2-3 (West 1995) (library districts); 
id.
 §§ 36-7-18-4, -5 (West 1997 & Supp. 1997) (local housing authorities).

29: 
E.g.
, Ind. Code Ann. § 36-8-11-18 (West 1997) (fire protection districts).

30: The county departments may contract to provide family preservation services, Ind. Code Ann. § 12-14-25.5-2 (West Supp. 1997), may hold liens--
jointly with the state agency
--against the real property of assistance beneficiaries, Ind. Code Ann. § 12-14-16-3, -12 (West 1994), and administer gifts or devises for the benefit of children under their care or supervision, Ind. Code Ann. § 12-1-3-6(c), (d) (West Supp. 1991) (repealed 1992).

31: The boards were briefly reconstituted as county welfare advisory boards which performed very limited research and reporting functions, 1986 Amends., § 55, 1986 Ind. Acts at 444-45 (adding Ind. Code ch. 12-1-24), until they were altogether abolished, 
see
 Act of May 2, 1989, Pub. L. No. 146-1989, § 1, 1989 Ind. Acts 1340, 1340 (repealing ch. 12-1-24).

32: 
See
 1986 Amends., § 11, 1986 Ind. Acts at 415 (amending Ind. Code § 12-1-3-3) (transferring appointment of directors of county departments from county boards to State Department).

33: 
See
 
1986 Amends., § 35, 1986 Ind. Acts at 429-31 (amending Ind. Code § 12-1-11-2) (transferring budgetary functions of county boards to county departments).

34: 
Other municipal corporations had greater control over their own employment matters than did the county departments.  
See, e.g.
, Ind. Code Ann. § 20-5-2-2(7) (West 1995) (school corporations); 
id.
 § 36-7-18-10 (West 1997) (local housing authorities); 
id.
 § 5-1-4-10(i) (West Supp. 1997) (hospital authorities). 

35: 
Ind. Code Ann. § 12-1-3-3 (West 1982) (amended 1983, 1986; repealed 1992).  

36: 
Ind. Code Ann. § 12-1-3-7 (West 1982) (amended 1986; repealed 1992). 

37: 
§ 12-1-3-3.

38: 
§§ 12-1-3-3, 7.

39: 
State Personnel Act, ch. 139, § 2, 1941 Ind. Acts 387, 388 (current version at Ind. Code Ann. § 4-15-2-3.8(1) (West Supp. 1997)).

40: 
§§ 12-1-3-3-, 7; 
see
 
State v. King
, 413 N.E.2d 1016 (Ind. Ct. App. 1980); 
Indiana Personnel Bd v. Galloway
 168 Ind. App 238, 342 N.E.2d 903 (Ind. Ct. App. 1976); 1937 Op. Att’y Gen. 129, 131.  

41: Ind. Code Ann. § 12-1-3-8 (West 1982) (amended 1983, 1986; repealed 1992).

42: 1986 Amends., § 11, 1986 Ind. Acts at 415 (amending § 12-1-3-3).

43: 1986 Amends., § 14, 1986 Ind. Acts at 420 (amending § 12-1-3-7).

44: 1986 Amends., § 2, 1986 Ind. Acts at 405-06 (amending § 5-10.3-7-1).

45: 1986 Amends., § 15, 1986 Ind. Acts at 420-21 (amending § 12-1-3-8).

46: For instance, Congress, appropriated $1.4 billion in fiscal year 1990 to support foster care and adoption assistance services around the country.  
See
 Department of Health & Human Services Appropriations Act of 1990, Pub. L. No. 101-166, tit. II, 103 Stat. 1166, 1175.  Similarly, during the 1985-86 fiscal year, the Indiana legislature appropriated $29 million to reimburse counties for public welfare employment costs.  
See
 Act of April 19, 1985, Pub. L. No. 372-1985, § 2, 1985 Ind. Acts 2503, 2549 [hereinafter 1985 Approps.].  In short, the state and federal contribution to a county department's budget has likely been substantial in any given fiscal year.

47: The counties retained authority to approve claims for administrative expenses, Ind. Code Ann. § 12-1-3-9 (West Supp. 1991) (repealed 1992), but the 1986 amendments clearly made the State Department responsible for paying these costs.  In addition, the power of the counties to make decisions regarding administrative expenses had been sharply limited even before 1986.  
See
 
Monroe Council
, 402 N.E.2d 1285 (Ind. Ct. App. 1980); 
Bartholomew Council
, 400 N.E.2d 1187 (Ind. Ct. App. 1980).